IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 01-cv-02315-LTB-CBS

HARVEY SENDER et al.,

Plaintiffs,

v.

WILLIAM JEFFREY MANN et al.,

Defendants.

---

### FREEBORN DEFENDANTS' RE-FILED SUMMARY JUDGMENT BRIEF

---

This case arises out of the bankruptcy of four entities (the "Lifeblood Entities") that bankruptcy trustee Plaintiff Harvey Sender alleges were operated by defendants Mann and Wells as vehicles for an illegal Ponzi scheme involving the sale of promissory notes.[1]  Despite years of investigation, Plaintiff has failed to adduce any evidence showing that the Freeborn Defendants acted other than appropriately.   Nevertheless, Plaintiff continues to claim that the Freeborn Defendants participated in Mann and Wells' fraudulent scheme.

Freeborn & Peters is a 125-lawyer, Chicago-based firm.  During relevant times, Freeborn & Peters had a Denver office where Poyfair and Sabian worked, respectively, as a partner and of counsel.  Mr. Sabian is a transactional business and securities attorney who has practiced law for 36 years.  Mr. Poyfair is a litigator experienced in complex business litigation.  These are the individuals and law firm who Plaintiff alleges conspired with Mann and Wells in a criminal Ponzi scheme.  Although certain Lifeblood Entities were clients of the Freeborn Defendants, an

---

[1] Both Mann and Wells pled guilty to criminal charges related to the Lifeblood Ponzi scheme and have completed their jail sentences.

attorney-client relationship is a far cry from a conspiracy.  The Freeborn Defendants' legal services primarily involved the creation of LLPs which were completely separate from the promissory notes – the sole basis of Plaintiff's alleged damages.  Lifeblood's formation, and the preparation of legal opinions regarding the notes, were done by other lawyers.  The Freeborn Defendants had **no** involvement in issuing the notes, and their acts had no causal connection to Plaintiff's alleged damages.  On the contrary, as soon as the Freeborn Defendants learned of the possible crime, they advised their client to turn itself in, and assisted in putting the company into bankruptcy for the benefit of the creditors.  These actions should be applauded – not vilified.

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In 1997, certain Lifeblood Entities retained Sabian to form LLPs.[2]  (Sabian Dep., Ex. A-1, at 11:23-12:9; 18:7-19:7, 69:17-70:17, 78:24-79:4.)  While some LLP interests were sold, the investments were returned.  Plaintiff is not claiming any damages related to the LLPs.

2.      In early October 1998, Lifeblood asked Poyfair to assist it in anticipated investor and regulatory litigation.  Poyfair made arrangements to visit Lifeblood's Florida offices to compile documents.  (Poyfair Dep., Ex. A-2, at 37:15-41:21; Mann Dep., Ex. A-3, at 393:4-14.)

3.      On October 14, 1998, Sabian and Poyfair learned that Mann had been indicted for his role in Legend Sports, an unrelated company that had issued promissory notes.  (Ex. A-3 at 392:20-393:3; Ex. A-1 at 101:1-23; Ex. A-2 at 93:9-19, 116:18-25, 236:2-15.)

4.      On October 19, 1998, Poyfair made his planned Florida trip, marked documents for copying, and asked that the copies be shipped to Denver for review.  (Ex. A-2 at 45:11-24,

---

[2] It is uncontroverted that Sabian was not told at the time that Lifeblood had issued notes.  (Sabian Dep., Ex. A-1 at 104:15-105:4; Wells Dep., Ex. A-4 at 461:18-463:2; Ex. A-22 at RFA 39-41.)

54:8-17, 71:14-20.)   At that time, Poyfair and Sabian did not know that Lifeblood had issued promissory notes.  (Ex. A-2 at 77:11-22, 80:7-12; Ex. A-3 at 404:15-405:7.)

5.       Poyfair did no work for Lifeblood prior to October 1998, which was the first time he heard of the concept of promissory notes.  (Ex. A-2 at 41:20-42:21; 127:15-22.)  Sabian did not learn of the notes until about October 20, 1998.  (Ex. A-1 at 104:15-105:4.)  No noteholder ever met, spoke with, or relied upon the Freeborn Defendants in purchasing or renewing notes.

6.       After the Florida trip, Poyfair left for a planned 10-day vacation.  (Ex. A-2 at 91:21-92:3; 123:14-23; 133:22-134:11; 186:5-187:1; Ex. A-5 (reflecting Nov. 6-16 absence).) Upon his return, Poyfair began investigating Lifeblood in order to prepare its response to any litigation or regulatory inquiries.  (*Id.*)  Poyfair's belief, and the only information known to him, was that the notes were guaranteed by bonds leaving an avenue for recovery for the noteholders in the event of Lifeblood's default.  (Ex. A-2 at 172:2-12; Ex. A-3 at 400:6-401:12.)

7.       In early November, Poyfair assisted Lifeblood in preparing a scripted response to inquiries regarding the notes to ensure that accurate and consistent information was being disseminated.   (Ex. A-2 at 168:9-24; Ex. A-3 at 396:23-397:11.)   At the time, Sabian was assisting Lifeblood in negotiations with a publicly-traded company, Juniper Group, for the sale of certain assets to Juniper in a transaction Mann hoped would resolve Lifeblood's cash flow problems.  (Ex. A-3 at 401:13-403:15; Ex. A-1 at 119:23-120:25; Hreljanovic Dep., Ex. A-6, at 111:12-112:3;  113:7-20;  120:16-124:11;  Pl. Dep. Exs. 112 and 495, attached as Ex. A-7; Hreljanovic Dep. Exs. 2 and 8-10, portions attached as Ex. A-8.)

8.       At the time the script was prepared, the Freeborn Defendants believed it to be accurate.  (Ex. A-2 at 168:9-24.)  Moreover, the principals of Lifeblood had not given the

Freeborn Defendants any reason to think the script was inaccurate.  (Ex. A-3 at 400:6-403:15.)

9.      As Poyfair's investigation progressed into mid-November 1998, he began to question whether Mann and Wells were being honest with him.  (Ex. A-2 at 188:14-23.)  Poyfair asked Wells about the bonding companies and received a cryptic response to "ask Jeff..."  (*Id.* at 100:13-22.)  Poyfair prepared to conduct a detailed interview of Mann.  (*Id.* at 93:4-8.)

10.     At the November 24, 1998 interview, Poyfair asked Mann why they didn't just sue the insurance companies that had defaulted on the bonds.  (*Id.* at 96:10-97:19; Ex. A-3 at 395:5-11.)  Mann then disclosed to the Freeborn Defendants, for the first time, that the bonding companies were fake.  (Ex. A-2 at 96:10-97:19; Ex. A-3 at 394:12-24.)

11.     Poyfair immediately advised Mann of possible criminal implications of that conduct and that Mann and the company should retain criminal counsel.  He referred them to Robert Merkle, a former U.S. Attorney, who thereafter assisted Lifeblood with the negotiations with authorities.  (Ex. A-2 at 96:10-97:19, 100:23-101:3; Ex. A-3 at 395:25-396:12.)

12.     The Freeborn Defendants researched their ethical obligations and determined that, unless Mann turned himself in, they would withdraw from representing Lifeblood.  (Ex. A-2 at 103:21-105:14.)  After Mann promptly turned himself in, Poyfair assisting Lifeblood in filing bankruptcy in order to recover as much money as possible for the noteholders.  (*Id.* at 28:6-29:15, 198:20-199:18; Ex. A-3 at 375:12-379:5; Royal Dep., Ex. A-9, at 37:15-38:1.)

13.     Based on standard hourly rates, the Freeborn Defendants were paid a total of $69,003 in fees and costs for work on behalf of the Lifeblood Entities.  (Ex. A-10, at 10, Fig. 6.)

14.     The noteholders stopped receiving interest payments in mid 1998, and started questioning the validity of the bonding companies by October 1998. *E.g.*, Ex. A-11 (questioning

master guarantee); Ex. A-12 (six different selling agents had requested copies of the bonds).

15.     In February 1999, the noteholders were informed of a criminal investigation into Lifeblood's activities.  (Ex. A-9 at 77:19-80:10; Ex. A-13, at p. 17.)  By early 1999, noteholders had brought claims against Lifeblood and others for breach of contract, fraud and breach of fiduciary duty based on unpaid notes.  (*See* Summary attached as Ex. A-14.)

16.     By September 1, 1999, several brokers retained an attorney to investigate claims against Lifeblood, and notified noteholders that the State of Florida had convicted Mann of fraud.  (Ex. A-13 at p. 61.)  By November 10, 1999, the noteholders were notified of a State of Florida Complaint against Lifeblood, Mann and Wells, alleging a Ponzi scheme. (*Id.* at p. 78-80.)

## II.     STANDARD OF REVIEW

Since the Freeborn Defendants do not bear the burden of persuasion at trial, they do not need to negate Plaintiff's claims, but need only point out a lack of evidence on essential elements of those claims.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).  Plaintiff cannot, in response to this motion, rest on allegations.  He must go beyond the pleadings and set forth *specific admissible facts* contained in affidavits, deposition transcripts, or deposition exhibits from which a rational trier of fact could find for him.  *Id.* at 671.  Plaintiff cannot do so.

## III.     ARGUMENT

**A.     Plaintiff Bears the Burden To Establish Standing, and Cannot Do So.**

Like any party attempting to invoke federal jurisdiction, a bankruptcy trustee bears the burden of establishing standing through the "triad of injury in fact, causation, and redressability." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998) (fn omitted); *In re Porter McCleod, Inc.*, 231 B.R. 786, 791 (D. Colo. 1999).  At the summary judgment stage, *Plaintiff* must establish there exists no genuine issue of material fact as to justiciability, by presenting

specific evidentiary facts.  *Dep't of Commerce v. U.S. House of Rep.*, 525 U.S. 316, 329 (1999); *Gilbert v. Shalala*, 45 F.3d 1391, 1394 (10th Cir. 1995).  Plaintiff cannot meet this burden.

       **1.**      **Plaintiff Lacks Standing To Assert The Liquidation Trust Claims Because "Sham Corporations" Can Have No Claims.**

Plaintiff asserts the Liquidation Trust's claims under sections 541 and 544 of the Bankruptcy Code.  (Sender Dep., Ex. A-15 at 120:16-18).  The Code makes plain, however, that the trustee's powers are ***limited to the actual or potential property of the bankruptcy estate***.  *In re Halabi*, 184 F.3d 1335, 1338 (11th Cir. 1999); *Sender v. Simon*, 84 F.3d 1299, 1304-05 (10th Cir. 1996).  To have standing to assert the Liquidation Claims, Plaintiff must show injury to the Lifeblood Entities – injury that would result in the Liquidation Claims having accrued to the debtor corporations as "property of the estate."   If the Lifeblood Entities suffered no injury, however, they would have no claims and neither would Plaintiff as trustee.  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093-94 (2d Cir. 1995) (trustee lacked standing to pursue claims predicated on misleading statements to investors where claims and resulting injury belonged solely to the investors); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (collecting cases); *Sender v. Kidder Peabody & Co.*, 952 P.2d 779, 782 (Colo. App. 1997) ("Sender…cannot show an injury to a legally protected right" and therefore lacked standing).

Plaintiff's contention that the Lifeblood Entities were merely "sham" corporations demonstrates that his attempt to invoke standing is groundless.  (Cmplt. ¶¶ 29, 30, 32, 33, 46, 64; Seawell Rept., Ex. A-16, pp. 2-3 ("[Lifeblood] had no legitimate business activities," "company never had any business operations," and "no significant business operations").)   Without any legitimate business operation, the Lifeblood Entities could not suffer a cognizable injury from which claims could accrue.  *Feltman v. Prudential Bache Sec.*, 122 B.R. 466, 474 (S.D. Fla.

1990) (where everything principal stole from debtor corporations, debtors had stolen from their creditors, "any alleged injury to the debtors is as illusory as was their corporate identity"). Under *Feltman*, Plaintiff lacks standing to use these illegitimate businesses as a vehicle for prosecuting claims that belong to the individual creditors.

**2.    Plaintiff Lacks Standing To Pursue The Opt-In Claims Under *Caplin*.**

Plaintiff admits that the Liquidation Trustee is acting pursuant to, and is therefore limited by, the Bankruptcy Code. Ex. A-15 at 120:16-18. As Liquidation Trustee, Plaintiff controls not only the claims asserted by the Liquidation Trust, he also controls the claims asserted by the Opt-In Trust, claims referred to in the Plan as "Individual Claims." Ex. A-17 at Annex, p. 9, § 6.8(a) and at Annex, Ex. B, p. 6, § 4.11. The purpose of the Opt-In Trust is directly tied to the Liquidation Trust. *Id.*, p. 3, § 2.3. Because it is the Liquidation Trustee who "in his sole and absolute discretion" controls all of the claims asserted in this case and who admittedly is restricted by the provisions of the Bankruptcy Code, Plaintiff's standing overall is restricted by the provisions of the Bankruptcy Code – whether applied to the Liquidation Trust claims or the Opt-In Trust claims. *Cf. Williams v. Cal. 1st Bank*, 859 F.2d 664, 666-67 (9th Cir. 1988).

The trustee lacks standing, however, to bring personal claims of creditors against third parties because personal claims are not property of the estate. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972) (three factors to consider are: whether money owed to the estate; impact of *in pari delicto*; risk of inconsistent results); *Simon* at 1305; *In re M & L Bus. Mach. Co.*, 136 B.R. 271, 273-77 (Bankr. D. Colo. 1992), *aff'd*, 160 B.R. 850 (D. Colo. 1993).

As to the first *Caplin* factor, the Opt-In Claims do not seek property of the estate. Claims based on breaches of duty and misrepresentations made directly to investors are individual creditor claims and not derivative claims seeking redress for injury to the corporation. *See M &*

*L* at 276; *Hirsch* at 1094; *Begier v. Price Waterhouse*, 81 B.R. 303, 305-06 (E.D. Pa. 1987) (trustee lacked standing to assert individual claims under § 544 because claims required proof of reliance as to each creditor). The same holds true for the COCCA claim. *See In re Hunt*, 149 B.R. 96, 103 (Bankr. N.D. Tex. 1992). By agreeing to limit fraud damages to certain testifying investors, *see* Dec. 2, 2004 Order, Plaintiff has admitted that the Opt-In Claims require proof of facts individual to each noteholder.

As to the second *Caplin* factor, it is undisputed that Mann's and Wells' misconduct will be imputed to the Lifeblood Entities. *Vail Nat'l Bank v. Finkelman*, 800 P.2d 1342, 1344-45 (Colo. App. 1990). Plaintiff therefore stands *in pari delicto* with these corporate insiders and is barred from recovering on the entities' claims. *See, e.g.*, *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100-02 (2d Cir. 2003); *In re Hunt* at 103. Plaintiff acknowledges that the *in pari delicto* doctrine applies. (Ex. A-15 at 128:16-129:12).

As to the third *Caplin* factor, there is a high risk of inconsistency between individual actions and the results here. Eleven noteholders have filed their own actions (Ex. A-14), with at least two of them recovering some amount. (*Id.*, Tab 11; Tyre Dep., Ex. A-18 at 16:20-17:6, 18:16-18; 75:3-23). In addition, individual lawsuits have been filed by noteholders who also assigned their claims to the Opt-In Trust. (Ex. A-14). Thus, *Caplin*'s concerns about duplicative litigation and inconsistent results have already materialized. Plaintiff's attempt to use the Opt-In Trust as a vehicle to circumvent *Caplin* should be rejected because the assignments cannot transform Opt-In Claims into estate property and confer standing on Plaintiff. *Williams* at 666-67; *Wit v. Firstar Corp.*, 879 F. Supp. 947, 1000 (N.D. Iowa 1995).

In addition, Plaintiff lacks standing to assert the Opt-In Claims for the independent reason

that he cannot establish that all noteholders' claims are assignable. Rather, each assignor's state law must be considered, and there are states that do not permit the assignments attempted here.[3]

## B.   All but two of Plaintiff's claims are time-barred.[4]

Professional negligence, COCCA and conspiracy claims are subject to a two-year statute of limitations. Colo. Rev. Stat. § 13-80-102.[5] As Plaintiff filed his complaint on November 30, 2001, Claim Nos. 16, 30 and 35 are time-barred if they accrued prior to November 30, 1999.

Those claims undoubtedly did accrue prior to November 30, 1999. With respect to the malpractice claim (Claim No. 16) brought on behalf of Lifeblood, Plaintiff alleges that Lifeblood falsely held itself out as a business "from December 1996 forward" and issued the promissory notes that constituted the Ponzi scheme in 1997 and 1998. (Compl. ¶¶ 29, 37-41.) Lifeblood is a corporation presumed to have knowledge of what is in its files and records, "and a judgment may be premised on that presumption in the absence of contrary evidence." *See, e.g., First Interstate Bank v. Berenbaum*, 872 P.2d 1297, 1300-1301 (Colo. App. 1993). If the Freeborn Defendants committed malpractice in October and November of 1998 as part of a scheme, Lifeblood is presumed to have known – and, in this case, definitively would have known – of the malpractice

---

[3] For example, Claim Nos. 3 (aiding and abetting fraud), 10 (aiding and abetting breach of fiduciary duty) and 34 (conspiracy) cannot be assigned by the investors in North Carolina and Massachusetts. *Investors Title Ins. Co. v. Herzig*, 413 S.E.2d 268, 271 (N.C. 1992) (conspiracy claim unassignable); *Horton v. New South Ins. Co.* 468 S.E.2d 856, 858 (N.C. App. 1996) (breach of fiduciary duty claim not assignable); *Baker v. Allen*, 197 N.E. 521, 524 (Mass. 1935) (fraud and breach of fiduciary duty claims unassignable).

[4] This argument covers Claim Nos. 3, 6, 10, 14 16, 30 and 35, where the statute of limitations is two or three years, but not Claim Nos. 33 or 34, which have a longer limitations period. Plaintiff has dismissed his RICO, aiding and abetting RICO, and aiding and abetting COCCA claims.

[5] *See also Noel v. Hoover*, 12 P.3d 328, 330 (Colo. App. 2000) (professional negligence); *F.D.I.C. v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1078 (D. Colo. 1997) (COCCA); *Stump v. Gates*, 777 F. Supp. 808, 823 (D. Colo. 1991) (conspiracy).

at the time those legal services were rendered.  As a result, the malpractice claim is barred.

With respect to the claims brought on behalf of the noteholders, namely Claim Nos. 30 and 35, the noteholders either knew or should have known of the fraudulent scheme prior to November 30, 1999.  Noteholders stopped receiving interest payments in mid-1998 and, in February 1999, were informed of the criminal investigation.  Section I *supra*.  By early 1999, noteholders were bringing claims against Lifeblood and, by September 1, 1999, they learned of Mann's fraud conviction.  *Id*.  Finally, by November 10, 1999, the noteholders were notified of the alleged Ponzi scheme.  *Id*.  Their claims had unquestionably accrued by that time, and the noteholders had notice of those claims.  The claims governed by a two-year statute are barred.

Plaintiff's fraud and breach of fiduciary duty claims are governed by a three-year statute, Colo. Rev. Stat. § 13-80-102(1), and therefore must be dismissed if they accrued prior to November 30, 1998.  As discussed above, the Liquidation Trust claims (Claim Nos. 6 and 14) are time-barred by Lifeblood's complicity in, and knowledge of, the alleged breaches prior to November 30, 1998.  The aiding and abetting fraud claim (Claim No. 3) brought by the Opt-In Trust is also barred.  Noteholders stopped receiving interest payments in mid-1998, started questioning the validity of the bonding companies by October 1998 and, by their own testimony, knew by early November 1998 that Lifeblood was a fraud.  (Section I *supra*; Ex. A-18 at 58:4-10, 63:15-20, 64:5-16 (by November 4, 1998, "everybody in the world knew this was a fraud.").  Thus, summary judgment should be granted on any claim for which the statute is three years or less (Claim Nos. 3, 6, 10, 14, 16, 30 and 35).

**C.      Plaintiff's aiding and abetting fraud claim is not cognizable under Colorado law.**

While aiding and abetting breach of fiduciary duty was recognized in *Holmes v. Young*, 885 P.2d 305, 309 (Colo. App. 1994), the Freeborn Defendants are unable to find any Colorado

appellate authority recognizing an aiding and abetting fraud claim.  As other courts explain it:

> If professionals such as accountants and lawyers could be held liable for fraud when their clients used their services to defraud a third party without the professionals' intent to participate in the fraud…[s]uch professionals would either have to incur the expense of investigation into how their services were being used or be placed in the position of insurers of their clients' honesty.  Either burden would add an unacceptable cost to the provision of necessary and desirable services.  Also, it seems illogical to impose liability for aiding and abetting fraud based upon a lower level of scienter than fraud itself.

*Branch Banking & Trust Co. v. Lighthouse Fin. Corp.*, 2005 WL 1995410 at *8 (N.C. Super. July 3, 2005) (refusing to recognize aiding and abetting fraud claim), attached as Ex. A-19; *Fed. Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio App. 2000) (same).

**D.      Plaintiff has no evidence to support the essential elements of his claims.**

**1.      <u>Plaintiff cannot establish any reliance.</u>**

Plaintiff must show detrimental reliance by the investors to prove each of his claims against the Freeborn Defendants.  *See* Freeborn Defendants' Response to Plaintiff's Brief Concerning Burden of Proof, filed Aug. 20, 2004.  Plaintiff has no such evidence.  Despite the fact that Plaintiff has deposed numerous investors, not one of them has ever met, spoken with, or relied upon any act of the Freeborn Defendants in purchasing or renewing their notes.

**2.      <u>Plaintiff's aiding and abetting claims fail because the Freeborn Defendants neither knew of nor substantially assisted in the principal violation.</u>**

Assuming *arguendo* that Plaintiff's aiding and abetting claims are cognizable, under *Holmes*, Plaintiff must show that (1) Mann and Wells committed the principal violation; (2) the Freeborn Defendants knowingly participated in the principal violation; (3) the Freeborn Defendants gave substantial assistance to Mann and Wells in committing the principal violation; and (4) the noteholders suffered damages as a result.  *See Nelson v. Elway*, 971 P.2d 245, 249-50 (Colo. App. 1998); *Holmes* at 308-09.  Plaintiff cannot show these elements.

- 11 -

a.     There is no evidence that the Freeborn Defendants knowingly participated in any wrongdoing, and Plaintiff's own expert concedes that they did not.

The gravamen of aiding and abetting is the defendant's "knowing participation" in the principal violation. *Holmes* at 309. Where claims against attorneys are involved, the elements of aiding and abetting should be strictly construed. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186-87 (Minn. 1999). As the Seventh Circuit held in affirming summary judgment:

> There is no direct evidence that [the law or accounting] Firm acted with intent to deceive any purchaser…. There is indeed no evidence that either Firm saw any of the…selling documents…until after the document had been placed in use…. A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant "must have had" knowledge…. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators…. In this case the Firms did not gain. They received none of the proceeds from the sales…. Both Firms billed so little time…that it is inconceivable that they joined a venture to…defraud[] investors.

*Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496-97 (7th Cir. 1986); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1128 (5th Cir. 1988) (although the law firm ignored several warning signs, "Aroused suspicions, however, do not constitute actual awareness of one's role in a fraudulent scheme."), *vacated,* 492 U.S. 914 (1989).

Plaintiff has failed, despite extensive discovery, to adduce facts supporting his claim that the Freeborn Defendants aided and abetted a fraud or breach of fiduciary duty. In particular, Plaintiff has not shown that these defendants *knowingly participated* in any of the alleged wrongful acts. The fact is that no such evidence exists. ***Even Plaintiff's own liability expert concedes the Freeborn Defendants did not act with the requisite intent***. (Seawell Dep., Ex. A-20 at 230:24-231:6.) Summary judgment therefore should be granted on Claim Nos. 3, 6 and 10.

b.     There is no evidence of substantial assistance to any fraudulent scheme.

An aiding and abetting claim also requires proof that the defendant provided "substantial

assistance" to the principal actor.  *Nelson*, 971 P.2d at 250; *see also* Sept. 16, 2002 Order at p. 5.

"Substantial assistance" is a large amount of assistance as distinguished from nominal or routine

assistance.  *First Fin. Sav. Bank, Inc. v. Am. Bankers Ins. Co.*, 1990 WL 260541 at *7-8

(E.D.N.C. July 5, 1990) (claim requires "positive deeds of manipulation or deception."), attached

as Ex. A-21; *Witzman* at 189 (substantial assistance requires "more than the provision of routine

professional services").   Plaintiff cannot show that the Freeborn Defendants gave substantial

assistance to Mann and Wells, who Plaintiff concedes were the masterminds of the scheme.  (*See*

Compl. ¶ 3; Ex. A-22 at RFA 4-9.)   On the contrary, the undisputed evidence shows that, upon

learning the bonding companies were not legitimate, Poyfair advised Mann to turn himself in.

The Freeborn Defendants did not provide assistance to the scheme, but instead helped stop it.

Courts recognize that a lawyer, simply by providing legal services, does not become an

aider and abettor.  For example, in *In re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558 (S.D. Fla.

1993), the plaintiffs alleged that two law firms (i) helped prepare fraudulent SEC filings,

(ii) drafted letters and press releases containing erroneous facts, (iii) defended the company

against accusations without investigating whether the company's representations were true, and

(iv) threatened individuals with legal action if they investigated the company.  *Id.* at 1563, 1565.

The district court dismissed the plaintiffs' aiding and abetting claim, in part, because:

> This [substantial assistance] element has been defined as requiring…that the law firm "actively participate[d] in soliciting sales or negotiating terms of the deal on behalf of a client. . . ."  …   Plaintiffs have failed to allege any activities on the part of [the law firms] that constituted anything more than acting as scriveners for their clients or conducting activities that make up the "daily grist of the mill."

*Id.* at 1566 (internal citation omitted); *Spinner v. Nutt*, 631 N.E.2d 542, 546 (1994) (allegation

that the client had acted under the legal advice of an attorney was insufficient to state a claim

against the attorney for aiding and abetting the client's breach of fiduciary duty).

Plaintiff has no evidence of anything more than the "daily grist of the mill" of a law firm. Setting aside the uncontested fact that the Freeborn Defendants helped **uncover** the scheme, their alleged acts never went beyond routine legal services.  There was no "substantial assistance."

c. <u>No noteholders were damaged by the alleged aiding and abetting.</u>

Plaintiff's aiding and abetting claims also fail because Plaintiff has no evidence that any damages were caused by the acts alleged.  To the contrary, the evidence shows that no damages could have been caused by the Freeborn Defendants.  The alleged acts of aiding and abetting occurred from mid-October to November 1998.  However, the Ponzi scheme ended on October 13, 1998 (with respect to Wells) and September 30, 1998 (with respect to Mann).  (Ex. A-23 at 13; Ex. A-24 at 13.)  Any acts occurring after the Ponzi scheme had already ended could not have aided the scheme, and could not have caused the noteholders any damage.

Moreover, the note proceeds had been spent – and the damages had been incurred – by early October 1998.[6]  The Freeborn Defendants' actions did not occur until mid-October, and therefore could not have caused further damage.

**3. Plaintiff has no evidence necessary to support his COCCA claim.**

The elements of COCCA are even more onerous than those for aiding and abetting, requiring Plaintiff to show that (1) the Freeborn Defendants (2) through a "pattern" of "racketeering activity" (3) directly or indirectly participated in the conduct of (4) an enterprise, and that (5) the noteholders were injured as a result.  Colo. Rev. Stat. § 18-17-104.  The burden

---

[6] Plaintiff's damage expert admits that all but $347,186 of the damages had been sustained by September 30, 1998, and, by October 1998, **all** of the damages had been sustained.  (Schulman Dep., Ex. A-22, at 159:22-160:3, 161:18-162:14.)

of proof under COCCA is clear and convincing evidence.   Colo. Rev. Stat. § 18-17-106(11).

Plaintiff cannot meet this heavy burden.   As a result, Claim No. 30 should be dismissed.

a.   <u>There is no evidence that the Freeborn Defendants participated in the conduct of an enterprise.</u>

A person cannot participate in the conduct of an enterprise unless he participates in the operation or management of the enterprise itself.   *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).[7]   And, the courts have uniformly held that an attorney does not become a participant simply by providing legal services.   *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1305 (D. Colo. 1998) ("attorney does not participate in the operation or management of an enterprise by offering legal advice or otherwise represent[ing] a client."); *Nolte v. Pearson*, 994 F.2d 1311, 1316 (8th Cir. 1993) (same); *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 832 F. Supp. 585, 590-91 (E.D.N.Y. 1993) (though attorney intended to advance client's scheme to defraud, no liability could be imposed because attorney's role was confined to providing legal services.).   Instead, there must be evidence that the attorney ***directed*** the enterprise's business activities.   *Gilmore v. Berg*, 820 F. Supp. 179, 183 (D.N.J. 1993) (dismissing RICO claim where attorney prepared partnership documents but did not direct client to engage in the transactions).

Plaintiff has no evidence that the Freeborn Defendants provided anything other than legal services.   They held no management or board positions in the Lifeblood entities, and received no compensation above their usual hourly rate.   Certainly, the Freeborn Defendants never directed

---

[7] Although *Reves* was decided under RICO, the relevant provision of COCCA is identical in all material respects.   *Compare* Colo. Rev. Stat. § 18-17-104(3) *with* 18 U.S.C. § 1962(c).   *See also F.D.I.C. v. First Interstate Bank*, 937 F. Supp. 1461, 1471 (D. Colo. 1996) ("COCCA and RICO differ only in the last clause [and] the difference is insignificant…").   COCCA was modeled after RICO, and cases interpreting RICO are instructive.   *New Crawford Valley, Ltd. v. Benedict*, 877 P.2d 1363, 1370 (Colo. App. 1993).

the business operations of the alleged enterprise (either Lifeblood or the Lifeblood Ponzi scheme). As the Ninth Circuit held under similar facts, a COCCA claim cannot stand:

> [T]he preparation of two letters…a partnership agreement…and assistance in a…Chapter 7 proceeding…does not suffice to impute liability under *Reves*. [The attorney] at no time held any formal position in the limited partnership. Nor did he play any part in directing the affairs of the enterprise. [His] role was limited to providing legal services to the limited partnership and [the corporation that formed the partnership]. Whether [the attorney] rendered his services well or poorly, properly or improperly, is irrelevant to the *Reves* test. We are therefore compelled to conclude that under the *Reves* "operation or management" test the complaint fails to allege a § 1962(c) cause of action as to [the attorney].

*Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993). The result should be no different here.

      b.      <u>Plaintiff has no evidence of intent on the part of the Freeborn Defendants.</u>

One cannot negligently commit a COCCA violation. *People v. Chaussee*, 880 P.2d 749, 758 n.12 (Colo. 1994) ("[A] pattern of racketeering activity is not in itself an offense under COCCA. Rather…it must be shown that the person…***knowingly*** conducted or participated in such enterprise through the pattern of racketeering activity." (Emphasis added.)). Plaintiff has no evidence of intent, a fact his own liability expert concedes. (Ex. A-20 at 230:24-231:6.)

      c.      <u>Plaintiff has no evidence of a "pattern" of racketeering activity.</u>

Plaintiff lacks any evidence of the requisite "pattern" of racketeering activity. A pattern of racketeering activity ***must*** include the commission of at least two predicate acts which are related to the conduct of the enterprise. Colo. Rev. Stat. § 18-17-103(3). While two predicate acts are necessary to establish a pattern, they are not necessarily sufficient. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985) ("in common parlance two of anything do not generally form a 'pattern,'" and legislative history supports the view that two isolated acts of racketeering activity are not a pattern.). Further, ***each defendant*** must have agreed to commit, or in fact have committed, two or more predicate crimes as part of his participation in the

enterprise. *See, e.g.*, *Feinstein v. RTC*, 942 F.2d 34, 41 (1st Cir. 1991).

The racketeering activity for which Plaintiff seeks damages is a Ponzi scheme that ended on October 13, 1998 (for Wells) and September 30, 1998 (for Mann).  (Ex. A-23 at 13; Ex. A-24 at 13.)  It is uncontested that the notes were all sold prior to October 1998, but that the Freeborn Defendants did not know the notes existed until October 20, 1998, and did not learn of the fraud until November 24, 1998.  The acts about which Plaintiff complains (e.g., drafting of the script) are not predicate crimes and, in any event, occurred *after* October 13, 1998.  Plaintiff has no evidence of even *one* predicate act that occurred during the pendency of the scheme, much less a pattern.  Certainly, Plaintiff cannot point to a pattern on behalf of *each* Freeborn Defendant.

> d.   No noteholders were damaged by the alleged predicate acts.

A COCCA plaintiff must prove that each predicate act was the ***proximate cause*** of his injuries.  *Deck*, 349 F.3d at 1257; *Floyd v. Coors Brewing Co.*, 952 P.2d 797, 803 (Colo. App. 1997), *rev'd on other grounds*, 978 P.2d 663 (Colo. 1999).  None of the Freeborn Defendants' actions caused any injury to the noteholders.   Section III.C.2.c *supra*.   On the contrary, it is uncontested that all the notes were sold before the Freeborn Defendants even knew they existed.

**4.   Plaintiff has no evidence that the Freeborn Defendants breached any duty, or that any alleged breach of duty caused Plaintiff any damages.**

To recover for breach of fiduciary duty, Plaintiff must establish that (1) a fiduciary duty existed; (2) that duty was breached; and (3) damages resulted. *Miller v. Byrne*, 916 P.2d 566, 575 (Colo. App. 1995).  The Freeborn Defendants represented certain Lifeblood Entities, and owed those clients fiduciary duties.   There is no evidence, however, that the Freeborn Defendants breached any duty.   Indeed, the companies' principals testified that they met or exceeded the standard of care.  (Ex. A-4 at 461:22-464:3; Ex. A-3 at 375:12-380:4, 415:16-23.)

Plaintiff's breach of fiduciary duty and negligence claims also fail because Plaintiff has no evidence of causation.   Section III.C.2.c *supra.*   Claim Nos. 14 and 16 therefore must be dismissed.   *C.J.I. Civ.* 4th §§ 9:18 and 9:20 (those claims require proof that defendant's conduct was a cause "without which the claimed injury would not have happened.").

### 5.   The Freeborn Defendants did not participate in a conspiracy.

Conspiracy requires proof of:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) resulting damages.   *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989). Moreover, an attorney, being an agent of his principal, cannot be held liable for conspiracy with his principal where he acts within the scope of his authority and does not actively participate in a fraud.   *Astarte, Inc. v. Pac. Indus. Sys., Inc.*, 865 F. Supp. 693, 708 (D. Colo. 1994).[8]  Plaintiff cannot prove any element of conspiracy.  Not one person has said that the Freeborn Defendants were involved in the promissory note scheme.   Not one alleged co-conspirator has ever implicated the Freeborn Defendants.  Plaintiff has no evidence of any conspiratorial conduct.

### E.   Plaintiff cannot prove any entitlement to punitive damages.

Punitive damages are available only where "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."  Colo. Rev. Stat. § 13-21-102(1).

---

[8] *Macke Laundry Svc. L.P. v. Jetz Svc Co., Inc.*, 931 S.W.2d 166, 176 (Mo. App. 1996) (citing cases for general rule that attorney cannot conspire with client); *Fraidin v. Weitzman*, 611 A.2d 1046, 1079-1080 (Md. App. 1992) ("It is established law that there can be no conspiracy between a principal and an agent where the agent acts within the scope of his or her employment…   [T]o substantiate a conspiracy claim, the plaintiff must establish that the attorney acted without legal justification and with the intent of injuring [and] that the attorney did not act within the role of an advisor and merely advise, but instead knew of the client's wrongful conduct and was actively involved in the wrongful conduct.…").

These elements must be proven beyond a reasonable doubt.  Colo. Rev. Stat. § 13-25-127(2); The sufficiency of the evidence to justify a punitive damage award is a question of law.  *Tri-Aspen Constr. Co. v. Johnson*, 714 P.2d 484, 486 (Colo. 1986).

Plaintiff has no evidence at all, let alone sufficient to prove beyond a reasonable doubt, that the Freeborn Defendants acted with the requisite "evil intent."  *Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341, 1342 (10th Cir. 1986).  On the contrary, the Freeborn Defendants were not involved in issuing the notes, and did not even know the notes existed until after the fact.  Plaintiff's own expert concedes that the Freeborn Defendants did not intentionally participate in a scheme.  Rather, it is undisputed that they uncovered it, and were instrumental in getting Mann to turn himself in.  It is also undisputed that the Freeborn Defendants had nothing to gain by any misconduct.  The note proceeds were not diverted to them, but were diverted by Mann and Wells.  (Compl. ¶ 2; Ex. A-22 at RFA No. 2.)  These facts do not approach the level of evil conduct required for a punitive damage award.

**F.      Plaintiff cannot recover prejudgment interest from the Freeborn Defendants, because they did not "wrongfully withhold" money or property.**

The right to recover interest where, as here, there is no agreement to pay it, is strictly limited to the circumstances enumerated in Colo. Rev. Stat. § 5-12-102.  *South Park Aggregates, Inc. v. Northwestern Nat'l Ins. Co.*, 847 P.2d 218, 226 (Colo. App. 1992).  The statute plainly requires that money or property have been ***wrongfully withheld*** in order for prejudgment interest to be awarded.  Colo. Rev. Stat. § 5-12-102(1); *South Park* at 227 ("To interpret § 5-12-102 as permitting recovery for *all* compensatory damages…would render meaningless the statutory language limiting prejudgment interest to that money or property 'wrongfully withheld.'").  One reason for this prerequisite is to limit prejudgment interest to situations where the defendant has

- 19 -

had the use of the amounts wrongfully withheld. *See Frontier Exploration, Inc. v. American Nat'l Fire Ins. Co.*, 849 P.2d 887, 893 (Colo. App. 1992).[9]  As a result, where the defendant is not the party who wrongfully withheld the plaintiff's money, prejudgment interest is not recoverable. *Messler v. Phillips*, 867 P.2d 128 (Colo. App. 1993).

As in *Messler*, the undisputed facts establish that the Freeborn Defendants never received, let alone "wrongfully withheld," money or property from noteholders.  Rather, it was Mann and Wells who diverted note proceeds.[10]  Plaintiff is not entitled to prejudgment interest.

## IV.   CONCLUSION

Despite years of discovery, Plaintiff has no evidence whatsoever to support his speculative allegations.  In fact, all evidence is to the contrary, and shows that the Freeborn Defendants had no complicity in or even knowledge of the Ponzi scheme.  The Freeborn Defendants simply acted as lawyers – not participants in a scheme.  It is uncontroverted that when the Freeborn Defendants did learn of the scheme, they counseled Lifeblood's chief officer to turn himself and the company in to the authorities.  As shown in the numerous cases cited above that granted summary judgment in favor of attorney defendants, *a plaintiff cannot create a disputed issue of material fact simply by showing that the defendants provided legal services*. In this case, Plaintiff can show nothing else.  Summary judgment therefore should be granted.

---

[9] If, and only if, this threshold requirement is met, does the Court need to determine the appropriate rate of prejudgment interest.  Colo. Rev. Stat. § 5-12-102(1)(a) and (b).  If the Court determines that prejudgment interest is recoverable, the Freeborn Defendants will address at trial the rate to be applied.

[10] The only possible exception could be the $69,003 that Plaintiff's expert acknowledges is the total amount Freeborn & Peters was paid by the Lifeblood Entities.  (Ex. A-10 at 10, Fig. 6.)  There is no evidence that the $69,003 came from note proceeds, however.

Dated this 29th day of December, 2005.

s/   Carolyn J. Fairless
Carolyn J. Fairless
Wheeler Trigg Kennedy LLP
1801 California Street, Suite 3600
Denver, CO  80202
Telephone:  (303) 244-1800
Fax:          (303) 244-1879
E-mail:       fairless@wtklaw.com

ATTORNEYS FOR DEFENDANTS FREEBORN & PETERS LLP, MICHAEL SABIAN, DARWIN J. POYFAIR

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on December 29, 2005, I electronically filed the foregoing FREEBORN DEFENDANTS' RE-FILED SUMMARY JUDGMENT BRIEF with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **Ann H. Cisneros**
  acisneros@lindquist.com stoms@lindquist.com

- **Herbert Anthony Delap**
  cdelap@duffordbrown.com ccarlson@duffordbrown.com

- **Carolyn J. Fairless**
  fairless@wtklaw.com hart@wtklaw.com

- **David W. Furgason**
  dfurgason@duffordbrown.com ccarlson@duffordbrown.com

- **James R. Leone**
  jrleoneattorney@yahoo.com

- **Michael L. O'Donnell**
  odonnell@wtklaw.com pointer@wtklaw.com

- **John C. Smiley**
  jsmiley@lindquist.com stoms@lindquist.com

- **Julie M. Walker**
  walker@wtklaw.com mcguire@wtklaw.com

and deposited a true and correct copy in the United States Mail to the following non CM/ECF participant:

W. Jeffrey Mann
419 Abbeyridge Court
Ocoee, FL  34761

s/   Carolyn J. Fairless by Janean C. Hart
Carolyn J. Fairless
Attorney for Defendants
 Lori Pollock and Lani Pollock
Wheeler Trigg Kennedy LLP
1801 California Street, Suite 3600
Denver, CO  80202
Telephone:  (303) 244-1800
Fax:          (303) 244-1879
Email:          fairless@wtklaw.com