**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 01-cv-02315-LTB-CBS

HARVEY SENDER, TRUSTEE OF THE LIFEBLOOD BIOMEDICAL, INC. LIQUIDATION
TRUST, et al.,

      Plaintiffs,

v.

WILLIAM JEFFREY MANN, et al.,

      Defendants.

---

**PLAINTIFF'S RESPONSE TO
FREEBORN DEFENDANTS' RE-FILED SUMMARY JUDGMENT BRIEF**

---

Plaintiff, Harvey Sender ("Plaintiff"), Trustee of the Lifeblood Biomedical, Inc.

Liquidation Trust ("Liquidation Trust") and the Lifeblood Biomedical, Inc. Opt-In Trust ("Opt-

In Trust"), for his Response (this "Response") to Freeborn Defendants' Re-Filed Summary

Judgment Brief (the "FD Brief"), states:

## I.  INTRODUCTION

In spite of ample evidence in the record to support Plaintiff's claims, the Freeborn

Defendants reiterate their request for summary judgment on virtually every conceivable issue.

The Freeborn Defendants make the same arguments with respect to Plaintiff's standing that this

Court has considered and rejected in a similar context and advocate an improperly expansive

application of *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972).  Neither tolling

principles nor applicable sections of the Bankruptcy Code are considered in the Freeborn

Defendants' request for judgment on limitations grounds.  Offering no analysis, the Freeborn

Defendants maintain a blanket position that a claim for aiding and abetting fraud does not exist in Colorado.  With those shortcomings at the forefront of the FD Brief, there remain genuine issues of material fact with respect to *what* the Freeborn Defendants knew or reasonably should have known about the fraud scheme, *when* they knew it and *what* they did to cause and exacerbate the damages from the initial wrongs to Lifeblood Biomedical, Inc. ("Lifeblood"), its related companies (together, the "Lifeblood Entities"),[1] and their creditors.

By narrowly focusing on creditors' investments in Lifeblood and the issuance of the fraudulent promissory notes, the Freeborn Defendants misdirect attention from their own conduct in accepting significant payments from the Lifeblood Entities after they knew the true facts.  The Freeborn Defendants siphoned money and diverted funds to the principal perpetrator of the fraudulent scheme, defendant William Jeffrey Mann ("Mann").  That conduct – continuing to assist Mann conceal his bad acts, prolonging the fraud and increasing damages to the Lifeblood Entities and their creditors after they knew full-well that Lifeblood was operated as a Ponzi scheme – is the linchpin.  Summary judgment simply is not appropriate.

## II.  MATERIAL FACTS IN DISPUTE[2]

1.      Long before the Lifeblood Entities retained the Freeborn Defendants to form limited liability partnerships ("LLPs") as a means of raising more money to prolong the façade of legitimacy, defendant Michael Sabian ("Sabian") was aware that Mann had formulated similar promissory note and LLP investment programs.  Sabian admits that he first met Mann in 1996 in

---

[1]  The Lifeblood Entities are: Lifeblood Biomedical, Inc., Lifeblood Cryogenics, Inc., New Millennium Group of Colorado, LLC, and Bluff Dale Corporation.

[2]  The materiality of each of the disputed facts recited in this Section II is discussed in connection with Plaintiff's Response to the supposed lack of evidence to support elements of Plaintiff's substantive claims and limitations issue.  *See infra* pp. 14, 17-20; FD Brief at pp. 11-18.

connection with an entity called Legends Sports; Sabian knew of Mann's involvement with raising money through promissory notes and LLP interests from their first encounter. *See* **Exhibit 1**, at pp. 61:9 to 62:20; 76:10 to 77:2; **Exhibit 2**, at pp. 10:22 to 11:22.

2.      Sabian knew at an early point – before he formally embarked on similar LLP matters for the Lifeblood Entities – that Mann had encountered difficulties raising money through promissory note programs because of regulatory scrutiny and that LLPs were an alternative mechanism for raising capital for Mann's business ventures. *See* **Exhibit 1**, at pp. 61:14 to 63:3; 76:10 to 76:24; **Exhibit 2**, at pp. 147:7 to 147:22.

3.      In March 1997, Sabian commenced work for one of the Lifeblood Entities, New Millennium Group, assisting in the formation of LLPs and preparing marketing materials. **Exhibit 1**, at pp. 61:21 to 61:22; **Exhibit 3**.  The Freeborn Defendants also did the same type of work for Lifeblood and a related entity, Icon Management Group, preparing materials for a series of so-called "Biobank" LLPs.  **Exhibit 2**, at pp. 68:23 to 70:17; 78:16 to 79:4.

4.      A Lifeblood broker who had sold Lifeblood promissory notes recalls a discussion with Sabian in June 1997, concerning regulatory issues raised in connection with promissory note sales and the anticipated sale of the LLP interests. *See* **Exhibit 4**, at pp. 79:18 to 81:6.

5.      In August 1997, Sabian nevertheless prepared a membership summary for one of several anticipated LLP investment vehicles and touted the legitimacy of Lifeblood's experience in the medical industry and its ownership of a non-existent facility in Vancouver.  **Exhibit 2**, at pp. 73:1 to 73:4 and 78:24 to 79:1; **Exhibit 5**; **Exhibit 6**.  Sabian admits that he had no basis for the representations concerning Lifeblood's experience and that Lifeblood never had a Vancouver facility.  **Exhibit 2**, at pp. 74:14 to 74:17; 81:12 to 81:14.

3

6.      North Carolina regulators issued a subpoena to Mann concerning Lifeblood promissory notes in April, 1998, and Freeborn & Peters and defendant Darwin J. Poyfair ("Poyfair") knew about that inquiry.  *See* **Exhibit 7**; **Exhibit 8**.

7.      Later that same year, in August 1998, Sabian assisted Mann and former defendant William Wells ("Wells") in developing yet another mixed promissory note and LLP capital raising venture, Cardiac Care Corporation.  *See* **Exhibit 2**, at pp. 133:18 to 134:23; **Exhibit 9**, at pp. 14:23 to 15:8; **Exhibit 10**.  Promissory notes for Cardiac Care Corporation were marketed through the same brokers that had sold Lifeblood notes and pushed on the same Lifeblood investors.  *See* **Exhibit 11**, at pp. 86:7 to 88:21.

8.      Even before the North Carolina investigation involving Lifeblood, however, in September 1997, both Sabian and Poyfair knew that Mann had received a subpoena from the Securities and Exchange Commission in connection with the Legends Sports promissory note scheme – they billed Lifeblood for work performed in connection with the Legends Sports subpoena.  *See* **Exhibit 2**, at pp. 139:6 to 139:16; **Exhibit 12**; **Exhibit 13**.  The claim that defendant Poyfair "did no work for Lifeblood prior to October 1998" is simply false.  *Compare* FD Brief at p. 3, ¶ 5 *with* **Exhibit 13**.

9.      The Freeborn Defendants' similar assertion that Sabian had no knowledge of the Lifeblood promissory notes before October 20, 1998, is belied by his knowledge of other promissory note programs, subsequent LLP offerings concocted by Mann and Wells, and conversations that at least one broker recalls with Sabian concerning regulatory inquiries.  *See supra* ¶¶ 1-5, 7.  A reasonably jury will conclude that the Freeborn Defendants were on notice of the Lifeblood fraud scheme long before October 1998.

10.     With knowledge of the problems associated with Mann's sale of promissory notes and LLP interests to the unsuspecting public as early as 1997, the Freeborn Defendants nevertheless requested and received payments totaling $300,000.00 from the Lifeblood Entities on October 7, 1998, as a retainer for their own fees.  *See* **Exhibit 14**; **Exhibit 15**, at pp. 212:24 to 213:6; **Exhibit 16**, pp. 201:7; 203:1 to 203:3.

11.     Within a week of those payments, Sabian and Poyfair knew that Mann had been indicted in connection with a promissory note and LLP interest venture that was much like the scheme Mann was using to obtain money through the Lifeblood Entities.  *See* FD Brief at p. 2, ¶ 3.

12.     By then, the Freeborn Defendants knew for certain that Lifeblood was insolvent and that it had no ability to repay the promissory note debt.  **Exhibit 1**, at pp. 43:10 to 43:16; 44:15 to 45:17; **Exhibit 15**, at pp. 181:20 to 182:8.

13.     The Freeborn Defendants nevertheless prepared scripts for dissemination to Lifeblood noteholders perpetuating an image of legitimacy that they knew was false.  *See* **Exhibit 17**; **Exhibit 18**; *see also* **Exhibit 15**, at pp. 91:21 to 94:1; 142:3 to 143:13; 144:9 to 144:18; **Exhibit 16**, at pp. 168:4 to 168:24; **Exhibit 19**.

14.     While representing that Lifeblood was in negotiations for a sale of assets to a publicly traded company, Juniper Group, Inc. ("Juniper"), the Freeborn Defendants did not disclose in their scripts that Juniper had rejected the proposal earlier that year or that Juniper was not interested in further negotiations.  **Exhibit 17**; **Exhibit 18**; **Exhibit 20**, at pp. 22:14 to 22:20; 33:8 to 33:13; 33:22 to 34:6.  No mention was made of critical facts that had been withheld from Juniper concerning Lifeblood's financial peril and Mann's indictment – facts that would have

ended even the dubious potential for a deal with Juniper.  **Exhibit 20**, 41:17 to 42:15; 91:4 to 91:17; 150:20 to 150:24.  One such script falsely asserted that an agreement had been reached with Juniper.  *See* **Exhibit 21**; *see also* **Exhibit 2**, at pp. 121:22 to 122:12.

15.     On December 3, 1998, after Poyfair knew that Mann had committed criminal acts, the Freeborn Defendants wired $100,000.00 of funds they had obtained from the Lifeblood Entities to Mann's personal criminal defense counsel.  **Exhibit 15**, at pp. 216:25 to 217:5; **Exhibit 16**, at pp. 113:6 to 113:13; **Exhibit 22**.

16.     More than six months later, on July 29, 1999, the Freeborn Defendants disbursed almost $30,000.00 of funds paid to them by the Lifeblood Entities directly to Mann.  **Exhibit 23**, at pp. 620:15 to 620:24; **Exhibit 24**.

17.     As late as March, 2000, the Freeborn Defendants transferred more than $123,000.00 of the remaining Lifeblood funds to Poyfair's new law firm, Snell & Wilmer, LLP. **Exhibit 25**, at p. 4 n.3.

18.     Neither the conspiracy nor the wrongful conduct for which Plaintiff seeks damages in this case against the Freeborn Defendants "ended" with a supposed termination of the Ponzi scheme on dates set forth in the plea agreements of Mann and Wells.  *See* FD Brief at p. 14 and Exhibits A-23 and A-24.[3]  The dates identified in the plea agreements are far from definitive concerning the cessation of the Freeborn Defendants' conduct in concealing Mann's fraud and diverting proceeds from scheme that they had obtained from Lifeblood to Mann and

---

[3]  The Freeborn Defendants have offered no authority for the proposition that dates identified in the plea agreements are binding with respect to separate and distinct causes of action for their ongoing conduct. Wells' plea agreement states that the criminal conduct occurred "through and including" those dates, in any event, and the plea agreements are silent with respect to other actionable civil wrongs that occurred or continued thereafter.  *See, e.g.,* FD Brief at Exhibit A-24.

others through March 2000, and cannot bind non-parties to the criminal proceedings.  *See*

*Central Bank Denver, N.A. v. Mehaffy, Rider, Windholz & Wilson*, 940 P.2d 1097, 1103-1104

(Colo. App. 1997) (discussing limitations on defensive non-mutual collateral estoppel).

### III.  ARGUMENT AND AUTHORITY

Summary judgment is warranted only "if the evidence presented by the parties

demonstrates 'that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.'"  *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir.

2001) (quoting Fed. R. Civ. P. 56(c)).  A dispute regarding material facts is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Fundamentally, "[s]ummary judgment does

not serve as a substitute for trial, and it does not require parties to dispose of their claims solely

on documentary evidence."  *Farnell v. Albuquerque Publ'g Co.*, 589 F.2d 497, 502 (10th Cir.

1978).

### A. Standing

In arguing that Plaintiff lacks standing, the Freeborn Defendants misconstrue the

Bankruptcy Code and the effect of confirmation of the Chapter 11 plan that created the two trusts

for which Plaintiff serves as trustee.  Starting with superficial analysis of the terms of the First

Amended Joint Plan of Liquidation for the Debtors (the "Plan"), the Freeborn Defendants assert

that "Plaintiff's standing overall is restricted by the provisions of the Bankruptcy Code."   FD

Brief at p. 7.  The Freeborn Defendants then extrapolate from that single faulty premise, ignore

well reasoned case law from this Court and rely on authorities decided in the context of statutory

bankruptcy trustees for the proposition that Plaintiff cannot, as a matter of law, establish standing

7

to prosecute claims brought in his capacity as the trustee of either the Liquidation Trust or the Opt-In Trust.  *See* FD Brief at p. 7.

Plaintiff plainly maintains standing to prosecute Liquidation Trust claims and Opt-In Trust claims in this case.  It is undisputed that the Bankruptcy Court confirmed the Plan and authorized the Plaintiff's dual-role as trustee of both the Liquidation Trust and the Opt-In Trust. *See* **Exhibit 26**; **Exhibit 27**.  The Freeborn Defendants likewise do not dispute – nor could they – that creditors of the debtor entities have assigned their claims to the Opt-In Trust, as authorized by the Plan and the confirmation order.   *See*, e.g., **Exhibit 28**.

The Freeborn Defendants nevertheless attempt to merge Plaintiff's capacity to prosecute claims under the terms of the Liquidation Trust (with respect to debtor-claims and creditor-derivative claims) and the Opt-In Trust (with respect to creditor-claims) and in so-doing they wholly ignore the Chapter 11 plan confirmation process.   The Bankruptcy Court's order confirming the Plan is of course a final judgment on the merits approving the terms of the Plan that created both the Liquidation Trust and the Opt-In Trust.  *Laing v. Johnson (In re Laing)*, 31 F.3d 1050, 1051 (10th Cir. 1994).

With respect to the claims asserted on behalf of the Liquidation Trust, Plaintiff seeks to redress, at least in part, injuries that are common to individual creditors who invested in Lifeblood.  A statutory trustee is empowered under § 544 of the Bankruptcy Code to assert state law claims that a judgment lien creditor could have asserted.  *See Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990).  Under Colorado law, "a judgment lien creditor has the right to pursue all claims available to a debtor corporation before bankruptcy is declared." *Anstine v. Alexander*, __ P.3d __, 2005 WL 913503, at *3 (Colo. App. April 21, 2005)

(concluding that Chapter 7 trustee had standing under § 544 to assert claims against corporation's attorneys for aiding and abetting breach of fiduciary duty) (attached as **Exhibit 29**). Indeed, this Court in *Sender v. Porter* (*In re Porter McLeod, Inc.*), 231 B.R. 786 (D. Colo. 1999), determined on similar facts as those presented in this case that § 544(a) of the Bankruptcy Code authorizes a trustee in bankruptcy to assert claims sounding in malpractice and aiding and abetting breach of fiduciary duty. *Porter*, 231 B.R. at 793. In his capacity as trustee of the Liquidation Trust, Plaintiff here may assert both claims of the debtor entities *and* creditor-derivative claims under § 544 of the Bankruptcy Code.

The Freeborn Defendants ignore § 544 to reach their desired conclusions that: (i) Plaintiff's Liquidation Trust claims are not actionable because Lifeblood was a sham and the claims were not property of the estate; and (ii) Plaintiff is nothing more than a garden-variety statutory bankruptcy trustee and thus *Caplin* its progeny preclude standing for prosecution of the Opt-In Trust claims. Despite a line of cases concluding that a trustee in the corporate Ponzi scheme context has no standing to assert claims belonging to the corporation, including *Feltman v. Prudential Bache Sec.*, 122 B.R. 466 (S.D. Fla. 1990), relied upon by the Freeborn Defendants, other well reasoned authorities conclude otherwise and recognize the practical implications of such a restrictive standing doctrine.

Even so-called "sham" corporations are "in the eyes of the law separate legal entities with rights and duties." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). Transferring cash – no matter how ill-gotten in the first instance – from a corporation for an unauthorized purpose and in breach of other duties is a sufficient injury to the corporate entity and its creditors. *See id.* (noting that investors and creditors of Ponzi scheme corporation "were tort creditors of the

corporations from which they had been inveigled" into paying for their investments); *see also Drabkin v. L&L Constr. Assoc., Inc. (In re Latin Inv. Corp.)*, 168 B.R. 1, 5 (Bankr. D.D.C. 1993) (recognizing that corporation operated as "classic pyramid scheme," and hence Chapter 7 trustee had claims against principals and others where misuse of corporation's funds "allowed, or was intended to allow [them] to loot the corporation of . . . funds deposited by the investors"). Where the conduct underlying the claims "relate[s] to how [the] defendants and the debtor's principals acted in concert to loot the debtor, the [Chapter 7] trustee has standing to seek redress for any damages the debtor suffered from [the] fraudulent scheme." *Latin Inv.*, 168 B.R. at 6. Injuries to the Lifeblood Entities from the Freeborn Defendants' knowing diversion of at least $300,000.00 for their own benefit and for Mann's benefit individually are "conceptually distinct" from the injuries suffered by Lifeblood's creditors and sufficient to confer standing to prosecute Liquidation Trust claims. *Gordon v. Basroon (In re Plaza Mortgage and Fin. Corp.)*, 187 B.R. 37, 41-42 (Bankr. N.D. Ga. 1995) (discussing standing for debtor/creditor claims and distinguishing *Feltman*).

*Caplin* does not dictate the result advocated by the Freeborn Defendants. Aside from the differences plainly evident between Chapter 7 and Chapter 11 cases where a plan has been confirmed, property of the estate under § 541 of the Bankruptcy Code includes claims acquired by a trustee through assignment after commencement of the bankruptcy case. *See Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 512 (4th Cir. 2005) (rejecting "per se ban on claims by trustees as assignees of creditors" and concluding that Chapter 7 trustee, as assignee of creditors' claims, had standing to maintain action for, among other things, civil conspiracy), *petition for cert. filed,* 74 U.S.L.W. 3303 (U.S. Oct. 31, 2005) (No. 05-563); *see also Collins v.*

*Kohlberg and Company (In re Southwest Supermarkets, LLC)*, 315 B.R. 565, 570-71 (Bankr. D. Ariz. 2004) (concluding that Chapter 11 trustee had standing to prosecute assigned claims).

The three bases underlying the rationale in *Caplin* are inapt here.  *See Caplin*, 406 U.S. at 429-32 (discussing former Bankruptcy Act restrictions, *in pari delicto*, and fear of inconsistent results from individual creditor suits).  First, the Opt-In Trust claims, once assigned to Plaintiff, became property of the Opt-In Trust.  The assignments are unconditional and irrevocable; no creditor retains any rights with respect to claims assigned, and Plaintiff prosecutes the claims for the benefit of all creditors of the Lifeblood Entities.  *See* **Exhibit 27**; **Exhibit 28**.[4]  The assignments in this case reserve nothing for specific creditors, who stand to share only pro rata as general creditors in accordance with the terms of the trust.  The unconditional and irrevocable nature of the assignments coupled with the terms of the governing Opt-In Trust address the concerns expressed in cases such as *Williams v. California First Bank*, 859 F.2d 664, 666-67 (9th Cir. 1988), where the court concluded that individual creditors remained real parties in interest because the assignments had been effected only for purposes of bringing suit.  Because the beneficiaries of the Opt-In Trust have retained no interest in their claims and will receive, if anything, only a pro rata distribution, the reasoning in *Caplin* and *Williams* does not apply.  *See Bogdan*, 414 F.3d at 513; *Southwest Supermarkets*, 315 B.R. at 570-71.

Second, the equitable doctrine of *in pari delicto* does not apply to preclude Plaintiff's claims.  The solitary reference to *Vail Nat'l Bank v. Finkelman*, 800 P.2d 1342 (Colo. App.

_____

[4]  The Freeborn Defendants' apparent challenge to the validity of the assignments by referencing the law of various jurisdictions that may not recognize assignments of tort claims conveniently overlooks that the assignments unquestionably are governed by Colorado law.  *See* **Exhibit 28**.  Even under well-recognized choice of law principles, Colorado law would apply to underscore the validity of the claims assigned to the Opt-In Trust.  *See Morgan v. United Air Lines, Inc.*, 750 F. Supp. 1046, 1054-55 (D. Colo. 1990).

11

1990), for the proposition that the fraudulent conduct of Mann and Wells will be imputed to the Lifeblood Entities as a matter of law, ignores the adverse interest exception.  *See id.* at 1344-45; *McFerson v. Bristol*, 214 P. 395, 396 (Colo. 1923).  If nothing else, the guilty pleas of Mann and Wells demonstrate that they neither acted legitimately or solely on behalf of the Lifeblood Entities, but instead pursued their separate personal interests for purposes of the adverse interest exception to *in pari delicto*.  *See* FD Brief at Exhibits A-23 and A-24; **Exhibit 30; Exhibit 31**.  Moreover, the doctrine "loses its sting" when the perpetrators of the wrong are removed, as in this case.  *See Scholes*, 56 F.3d at 754-55.  *In pari delicto* is a defense premised on "concern for the public welfare," *Tolz v. Proskauer Rose, LLP (In re Fuzion Tech. Group, Inc.)*, 332 B.R. 225, 233 (Bankr. S.D. Fla. 2005), which would not be served if applied unyieldingly in this case.

The final argument for a conclusion that Plaintiff lacks standing under *Caplin* – the fear of inconsistent results – similarly diminishes as time passes.  That noteholder suits may have been filed against the Lifeblood Entities has no bearing on Plaintiff's claims *against the Freeborn Defendants* and will affect, if anything, only distributions to beneficiaries of the Opt-In Trust.  The Freeborn Defendants are not named as defendants in any other suit identified in the FD Brief or otherwise.  The "high risk" of inconsistent results simply does not exist.

The practical effects of the Freeborn Defendants' standing arguments should not be overlooked.  While on the one hand applauding their own efforts in rendering legal advice to the Lifeblood Entities and taking credit for the bankruptcy filing as an effort to benefit creditors, the Freeborn Defendants seek, on the other hand, to hamstring the very trustee who has pursued recovery for those creditors.  Under the simplistic standing analysis of *Feltman* and like cases,

the end result would be that "the bankruptcy process is of no utility for creditors of Ponzi scheme debtors." *Plaza Mortgage*, 187 B.R. at 41; *see Bogdan*, 414 F.3d at 515.

### B.  Plaintiff's Claims Are Not Time Barred

As set forth in Plaintiff's Motion for Summary Judgment Concerning Affirmative Defenses and Counterclaims, filed on April 11, 2005, at docket entry number 455, no statute of limitations precludes any of Plaintiff's claims.  There is no dispute that three of the four Lifeblood Entities filed voluntary bankruptcy petitions on July 26, 2000, and the remaining entity filed its petition on August 2, 2000.  *See* **Exhibit 32** at 2, 4, 6, 7; *see Holbrook v. Anderson Corp.*, 130 F.R.D. 516, 520 n.3 (D. Me. 1990) (recognizing that district court may take judicial notice of docket in bankruptcy court); *see also* 28 U.S.C. § 151 (bankruptcy court is a "unit" of the district court).  Those voluntary petitions constituted orders for relief and § 108 of the Bankruptcy Code plainly extended applicable limitations periods that had not expired before commencement of the bankruptcy cases for an additional two years.  *See* 11 U.S.C. §§ 108(a); 301.

Instead of focusing on when Plaintiff's Liquidation Trust claims accrued for commencement of the limitations period and application of § 108, the Freeborn Defendants instead work backward from the date of Plaintiff's complaint, November 30, 2001, and fail to acknowledge the intervening bankruptcy.  Even if, as posited by the Freeborn Defendants, the default in interest payments on the Lifeblood promissory notes occurred in November 1998 and creditors' suspicions triggered applicable limitations periods,[5] the bankruptcy cases were filed

---

[5]  The Freeborn Defendants' record citations concerning a supposed default in interest payments in November 1998, do not support that factual proposition.

within two years.  Because § 108 applies, Plaintiff timely filed the complaint in this case with respect to any cause of action for which the statute of limitations is two years or more, including the malpractice claim.  *See, e.g., National Envtl. Waste Corp. v. Stephens, Berg & Lasaster (In re National Envtl. Waste Corp.)*, 200 F.3d 1266, 1268 (9th Cir. 2000) (concluding that § 108 is "clear" and allows additional two years beyond petition date for malpractice suits).

The claims brought by Plaintiff in his capacity as the trustee of the Opt-In Trust also are timely.  The Freeborn Defendants assert that the noteholders were aware of the fraud in November, 1998, for purposes of accrual but they otherwise ignore settled tolling principles.  If material information was concealed by a wrongdoer – information that "in equity and good conscience" should have been disclosed – statutes of limitation are tolled.  *First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. App. 1987).  The Freeborn Defendants rendered substantial assistance in continuing the Lifeblood ruse long past November, 1998 and well into the bankruptcy case.  *See supra* p. 5, ¶ 10; p. 6, ¶ 17.  Funds obtained from the Lifeblood Entities were paid directly to Mann in 1999 and transferred to Poyfair's new law firm in 2000.  *See supra* p. 6, ¶ 16.  The bankruptcy case was orchestrated as a Chapter 11 case so that Mann could remain in control of the Lifeblood Entities and delay any objective inquiry into the scheme.  *See* **Exhibit 23**, at pp. 234:11 to 235:9.  A limitations period does not commence "until the plaintiff discovers, or in the exercise of *reasonable diligence* should have discovered, the existence of facts forming the basis for the claim for relief."  *First Interstate,* 744 P.2d at 1201 (emphasis added).  No creditor in this case – even those formally investigating the promissory note scheme soon after a default in interest payments – could have discovered the extent of the Freeborn Defendants' knowledge and the scope of their

participation.  *See* **Exhibit 11,** at pp. 41:11 to 41:20; 43:7 to 45:3.  Only after appointment of the Chapter 11 trustee in October 2000, could a full investigation into the facts begin.  That assignments to the Opt-In Trust have occurred since commencement of this case is of no moment for purposes of the limitations periods.  *See Travelers Ins. Co. v. Gasper*, 630 P.2d 97, 100 (Colo. App. 1981).

### C. Colorado Law Encompasses Aiding and Abetting Claims

In a two-sentence paragraph, the Freeborn Defendants rely on a quotation from a North Carolina opinion and a string citation to Ohio case law for the proposition that a claim for aiding and abetting fraud does not exist in Colorado.  Aside from authority from more storied jurisdictions recognizing such a claim, *see, e.g., In re WorldCom, Inc. Sec. Lit.*, 382 F. Supp.2d 549, 560 (S.D.N.Y. 2005), Colorado law is broad enough to include a claim for aiding and abetting fraud.  Indeed, this Court has recognized that Colorado law encompasses claims for "aiding and abetting a tortious act," and not just aiding and abetting breach of fiduciary duty. *See Porter*, 231 B.R. at 793 (citing *Holmes v. Young*, 885 P.2d 305, 208 (Colo. App. 1994)); *see also National Union Fire Ins. Co. v. Kozeny*, 115 F. Supp.2d 1231, 1236 (D. Colo. 2000) (acknowledging aiding and abetting fraud claim in context of Colorado long-arm statute and exercise of personal jurisdiction over corporation used in aiding and abetting tortious acts). Aiding and abetting liability attaches in Colorado "if the party whom the defendant aids performs a *wrongful act* that causes an injury, the defendant is generally aware of his role as part of an overall *illegal or tortious activity* at the time that he provides assistance, and the defendant knowingly and substantially assists the principal violation."  *Holmes*, 885 P.2d at 308 (emphasis added).

**D.  There Is Ample Evidence to Support A Jury Verdict Against the Freeborn Defendants**

*1. Reliance is Not An Element of the Claims Against the Freeborn Defendants*

With a single reference to a separately filed response brief as authority, the Freeborn

Defendants contend that detrimental reliance is necessary for each and every claim asserted

against them.  *See* FD Brief at p. 11.  The Freeborn Defendants are wrong, as explained in

Plaintiff's Brief Concerning Burden of Proof for Remaining Creditor-Related Claims, filed on

July 23, 2004, at docket entry number 430, and the authorities cited therein.  Even if detrimental

reliance is an element, "[d]irect evidence is not required" and it may be inferred from

circumstantial evidence.  *Loughridge v. Goodyear Tire and Rubber Co.*, 192 F. Supp.2d 1175,

1184 (D. Colo. 2002).  None of Plaintiff's claims against the Freeborn Defendants – whether

Liquidation Trust claims or Opt-In Trust claims – requires detrimental reliance as an element of

Plaintiff's proof.

*2.  Evidence Exists to Support a Jury Verdict for Aiding and Abetting Liability*

Evidence of substantial assistance is sufficient "where a defendant 'affirmatively assists,

helps conceal, or by virtue of failing to act when required to do so enables [a] fraud to proceed.'"

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp.2d 452, 470 (S.D.N.Y. 2001); *see Neilson v. Union*

*Bank of California, N.A.*, 290 F. Supp.2d 1101, 1127-28 (C.D. Cal. 2003) (recognizing that

evidence concerning financial gain is properly considered "as evidence of knowledge, substantial

assistance, or both").  Express knowledge of the primary fraud is not required and liability may

attach if the defendant was "generally aware of his role as part of an overall illegal or tortious

activity."  *Holmes*, 885 P.2d at 308.

It is undisputed here that the Freeborn Defendants were at least "generally aware" of Mann's fraudulent promissory note and LLP schemes as early as 1997. *See supra* p. 2, ¶ 1; p. 3, ¶ 2. The Freeborn Defendants nevertheless obtained tainted funds from the Lifeblood Entities when they expressly knew of Mann's fraudulent scheme, proceeded to conceal those funds and then paid them to Mann's criminal defense lawyers and to Mann personally. *See supra* p. 6, ¶¶ 15, 16. More than $100,000.00 was subsequently shifted to Poyfair's new law firm in anticipation of "assisting" the Lifeblood Entities with a bankruptcy filing – a filing that envisioned Mann's continued control of the litigation claims in the case – and significant fees for the Freeborn Defendants. *See supra* p. 6, ¶ 17. The supposed "grist of the mill" for the Freeborn Defendants includes misdirection of funds belonging to a corporate client and its creditors for the benefit of known criminals. That conduct supports Plaintiff's aiding and abetting fraud claim.[6]

### 3. *Evidence Exists to Support a Jury Verdict Under COCCA*

The FD Brief is tellingly devoid of any analysis of the separate conspiracy claims under the Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. § 18-17-104(4). Two predicate acts of mail fraud (Wells) and conspiracy to commit securities fraud (Mann) support Plaintiff's COCCA claims. *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1478 (D. Colo. 1995); *see* **Exhibit 30**; **Exhibit 31**. In addition, the Freeborn Defendants received proceeds from racketeering activity, concealed those funds in their client trust account and ultimately made at least two payments for Mann's personal benefit. *See supra* p. 6, ¶ 15; *F.D.I.C. v. Refco Group, Ltd*., 989 F. Supp. 1052, 1074-75 (D. Colo. 1997). The Freeborn Defendants knowingly

---

6  Colorado law is settled that "wrongful intent is not necessary to establish a claim for aiding and abetting a breach of fiduciary duty." *Nelson v. Elway*, 971 P.2d 245, 250 (Colo. App. 1998).

laundered the ill-gotten gains through their own enterprise – regardless of their participation in the management of the various Lifeblood Entities.  *See United States v. Sanders*, 928 F.2d 940, 943 (10th Cir. 1991) (existence of formal or informal enterprise and membership apart from racketeering activity are fact questions for jury).  The pattern and predicate acts sufficient for COCCA liability is evident in the Freeborn Defendants' preparation of scripts for dissemination to investors, concealment of funds, payments to Mann's criminal defense lawyers and Mann individually and then shifting funds for their own benefit in transferring the money to Poyfair's new law firm.  *See supra* p. 6, ¶ 17; *Refco*, 989 F. Supp. at 1075-76 (preparation of "investment advisor letter" for Ponzi scheme created material factual issue as to direct or indirect participation for COCCA liability).  Those acts occurred over a period of years and involved the Freeborn Defendants' firm in hiding money obtained from the Lifeblood scheme for Mann.  *See New Crawford Valley, Ltd. v. Benedict*, 877 P.2d 1363, 1372-73 (Colo. App. 1993).

    *4.  The Freeborn Defendants Breached Duties to Lifeblood and Caused Damages*

      Evidence concerning the Freeborn Defendants' direct breach of fiduciary duty to their stated client – Lifeblood – is plain from their diversion of corporate funds to Mann and for Mann's personal benefit.  *See supra* p. 6, ¶¶ 15-17.  No matter the ultimate source of the funds paid to the Freeborn Defendants, their acceptance of $300,000.00 from their client and subsequent shifting of those funds for the benefit of a corporate insider, whom they at least suspected had engaged in criminal conduct, will lead a reasonable jury to conclude that the Freeborn Defendants breached their duties of loyalty to the Lifeblood Entities.  *See Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 857 (Colo. App. 2003) (recognizing "rebuttable presumption of breach" where evidence of use of funds in fiduciary capacity is present).  Those

breaches undoubtedly decreased the money available for the Lifeblood Entities and their creditors sufficient for causation and damages.  *See Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 459 (Colo. App. 2003).

*5.  Conspiracy*

The Freeborn Defendants lose sight of the fact that that Plaintiff's conspiracy claim against them concerns their conduct with Mann individually after they learned that Lifeblood was a Ponzi scheme.  The cases stating that an agent cannot conspire with its principal are inapt, as Plaintiff's claims are markedly different.  The Lifeblood Entities were the Freeborn Defendants' clients – not Mann.  *See* FD Brief at p. 2, ¶ 1.  After the Freeborn Defendants knew that Lifeblood was insolvent beyond hope, and after they knew that Mann had defrauded Lifeblood investors, they continued to further his personal interests and followed Mann's instructions in diverting money that they knew had been generated from his fraud.  *See T.A. Pelsue Co. v. Grand Enter., Inc.,* 782 F. Supp. 1476, 1490 (D. Colo. 1991) (noting that co-conspirators are jointly and severally liable for all damages).

**E.  Disputed Issues of Fact Preclude Summary Judgment on Punitive Damages**

In arguing that Plaintiff has no evidence to support a claim for punitive damages under Colo. Rev. Stat. § 13-21-102, the Freeborn Defendants maintain their narrow focus on the original issuance of the promissory notes to Lifeblood investors.  *See* FD Brief at p. 19.  There is, however, substantial evidence concerning the Freeborn Defendants' diversion of money *from the Lifeblood Entities*, including their acceptance of a $300,000.00 payment after they knew Mann had been indicted in connection with another promissory note/limited partnership interest investment ploy.  *See supra* p. 5, ¶¶ 10, 11.  Those funds – paid by the Lifeblood Entities to the

Freeborn Defendants – subsequently were doled out to Mann's personal criminal defense counsel, Mann himself and then to Poyfair's new law firm for anticipated fees for the bankruptcy case. *See supra* p. 6, ¶¶ 15, 17.  The last of those payments occurred years after the Freeborn Defendants knew about the fraudulent scheme.  Willful and wanton conduct sufficient for an award of exemplary damages under Colo. Rev. Stat. § 13-21-102, exists where the "behavior further aggravated the damages of the other party, when the wrongdoer knew or should have known that such conduct would cause aggravation." *Double Oak Constr., LLC v. Cornerstone Dev. Int'l, LLC*, 97 P.3d 140, 149 (Colo. App. 2003).  The Freeborn Defendants' concealment of funds with express knowledge of the fraud supports an award of punitive damages.

**F.  Summary Judgment Concerning Plaintiff's Right to Prejudgment Interest Is Premature**

Prejudgment interest here is appropriate pursuant to Colo. Rev. Stat. § 5-12-102, which is subject to a liberal construction and may apply even where there is no tortious conduct by the party withholding funds. *See Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362, 364-65 (Colo. 1989).  "[V]ictims of tortious conduct are clearly entitled to prejudgment interest under the statute." *Estate of Korf v. A.O. Smith Harvestore Prod., Inc.*, 917 F.2d 480, 486 (10th Cir. 1990).  The Freeborn Defendants again ignore Plaintiff's Liquidation Trust claims and the fact that they sucked $300,000.00 from the Lifeblood Entities and transferred it to others for Mann's personal use and benefit.  With respect to Plaintiff's Opt-In Trust claims, the Freeborn Defendants cannot escape prejudgment interest in light of evidence supporting their conspiracy liability. *See T.A. Pelsue,* 782 F. Supp. at 1490.

## IV.  CONCLUSION

For all of the foregoing reasons, Plaintiff requests entry of an order denying the Freeborn

Defendants' request for summary judgment.

Dated this 18th day of January, 2006.

                                      Respectfully submitted,


                                        s/Theodore J. Hartl
                                        John C. Smiley, #16210
                                        Ann H. Cisneros, #32547
                                        Theodore  J. Hartl, #32409
                                        LINDQUIST & VENNUM P.L.L.P.
                                        600 Seventeenth Street, Suite 1800 South
                                        Denver, CO 80202
                                        Telephone: (303) 573-5900
                                        Facsimile: (303) 573-1956
                                        jsmiley@lindquist.com
                                        acisneros@lindquist.com
                                        thartl@lindquist.com

                                        Counsel for Harvey Sender, as Trustee of the Lifeblood Biomedical, Inc. Liquidation Trust and Trustee of the Lifeblood Biomedical, Inc. Opt-In Trust

22

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing **PLAINTIFF's RESPONSE TO FREEBORN DEFENDANTS' RE-FILED SUMMARY JUDGMENT BRIEF,** was made by U.S. Mail, first class postage prepaid, this 18th day of January, 2006, on all persons and entities listed below:

James R. Leone, Esq.
James R. Leone, P.A.
3188 Oak Lane
Edgewater, FL 32132

William Jeffrey Mann
419 Abbeyridge Ct.
Ocoee, FL 34761

Michael L. O'Donnell, Esq.
Carolyn J. Fairless, Esq.
Julie Walker, Esq.
Wheeler, Trigg & Kennedy
1801 California Street, Suite 3600
Denver, CO 80202

s/Laura Lee Rippe

Doc# 2102776\1