IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE

Civil Action No. 01-cv-02315-LTB-OES

In re:

HARVEY SENDER, TRUSTEE OF THE LIFEBLOOD BIOMEDICAL, INC. LIQUIDATION
TRUST and HARVEY SENDER, TRUSTEE OF THE LIFEBLOOD BIOMEDICAL, INC.,
OPT-IN TRUST,

      Plaintiffs,

v.

WILLIAM JEFFREY MANN, an individual, WILLIAM WELLS II, an individual, FREEBORN
& PETERS, an Illinois partnership, MICHAEL SABIAN, an individual, DARWIN J. POYFAIR,
an individual, MERKLE & MAGRI, a Florida professional association, JAMES R. LEONE, P.A.,
a Florida professional association, JAMES R. LEONE, an individual, and THE WILLIAM &
ELAINE WELLS FAMILY LIMITED PARTNERSHIP, a Florida limited partnership,

      Defendants.

---

## ORDER

---

    This Order addresses the motion by plaintiff Harvey Sender ("Sender") for summary

judgment dismissal of numerous affirmative defenses and counterclaims pled by defendants

Freeborn & Peters, Michael Sabian and Darwin J. Poyfair (collectively the "Freeborn

defendants"), and James R. Leone, P.A. and James R. Leone (the "Leone defendants.") (Dckt. #

455), and also the Freeborn defendants motion for summary judgment on Sender's claims for lack

of standing, filing outside of the statute of limitations, pleading claims not cognizable under

Colorado law and lack of evidence to support essential elements of his claims. (Docket # 500).

For the reasons discussed below Sender's motion is DENIED in part and GRANTED in part, and

the Freeborn Defendants' motion is DENIED in part and GRANTED in part.

# I.  BACKGROUND

This case concerns an alleged ponzi scheme perpetrated by defendants William Jeffrey Mann ("Mann") and William Wells II ("Wells") from 1996 until about 1998. A ponzi scheme is defined as "a fraudulent investment scheme in which 'profits' to investors are not created by the success of the underlying business venture but instead are derived from the capital contributions of subsequently attracted investors." *Sender v. Simon,* 84 F.3d 1299, 1301 fn. 1 (10th Cir. 1996). Wells and Mann organized and operated four business entities (referred to collectively herein as "Lifeblood") that issued phony promissory notes to investors. The scheme hinged on the portrayal of Lifeblood as a legitimate, and viable, medical related business in order to promote and sell these notes.  The notes were presented as sound investments, backed by appropriate insurance. In fact, the notes were not insured. Two sets of promissory notes were issued, one in 1997 and one in 1998. When the ponzi scheme collapsed in 1998, the note-holders, about 200, had lost the money they paid for the notes and were left holding worthless notes.

On July 26, 2000 Lifeblood filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado ("Bankruptcy Court"). On or about June 11, 2001, the Bankruptcy Court entered its Confirmation Order confirming The Proponents' First Amended Joint Plan of Liquidation for the Debtors (the "Plan.") The Plan calls for the creation of the Liquidation Trust, the Trust established to collect and liquidate all of the assets of the debtor entity, Lifeblood; and the Opt-in Trust, the Trust established to pursue the interests of and recover funds owed to the defrauded note-holders**.** The Plan designates Sender as Trustee of both the Liquidation Trust and the Opt-in Trust. Most of the note-holders, as beneficiaries of the Opt-in Trust, have assigned their individual

claims to the Opt-in Trust.  Sender filed this action on November 30, 2001, alleging 35 claims in state and federal law on behalf of Lifeblood and on behalf of the note-holders, Lifeblood's creditors.

The Freeborn defendants and the Leone defendants are lawyers who did legal work for Mann and Wells. The Freeborn defendants are the Chicago-based law firm of Freeborn and Peters, and Michael Sabian ("Sabian") and Darwin Poyfair ("Poyfair"), two lawyers at Freeborn and Peters.  The Leone defendants are James R. Leone, P.A., a Florida professional association, and James R. Leone, an attorney operating as a solo practitioner in Florida. Sender's remaining claims against them are for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, malpractice, violations of the Colorado Organized Crime Control Act ("COCCA"), fraudulent transfer (actual and constructive) and conspiracy.

This Order addresses two motions for summary judgment. The first motion is by Sender, seeking summary judgment on numerous defenses and counterclaims raised by the Freeborn and Leone defendants. The second motion is by the Freeborn defendants, seeking summary judgment on several of Sender's claims. Since the motion by the Freeborn defendants argues the absence of a factual basis for many of Sender's claims, I will review the facts regarding their involvement with Lifeblood in some detail.

Sabian first met Mann in 1996 and first became aware of Mann's unorthodox financial dealings in 1997. Sabian was doing legal work for a client of Mann's, and learned that Legend Sports,  an entity with which Mann was affiliated, had encountered difficulties using promissory notes to raise funds because Florida securities officials treated these notes as securities.

Sabian first did legal work for a Lifeblood entity, New Millennium, in March of 1997, helping New Millennium develop Limited Liability Partnerships to raise money.  In June of 1997, Sabian spoke to a Lifeblood broker who told Sabian that some states had construed promissory notes as securities, and inquired whether the LLPs would have similar problems. In August of 1997, Sabian prepared a membership summary for a Lifeblood investment vehicle, Bio Bank, which stated falsely that Lifeblood owned a facility in Vancouver. Sabian later stated that he relied on Wells for this information and did not know it was false.

In September of 1997, Sabian and Poyfair did legal work for Mann associated with an SEC subpoena regarding the Legend Sports promissory notes.  In April of 1998, Poyfair became aware that regulators in North Carolina had issued a subpoena to Mann requesting information regarding the Lifeblood promissory notes. In August of 1998, Sabian assisted Mann and Wells in developing a mixed promissory note and LLP venture, Cardiac Care, which used the same agents and customers as Lifeblood. Significantly, the record does not show any involvement by the Freeborn defendants in preparing or assisting in preparing the promissory notes that were the basis for the ponzi scheme.

On October 7, 1998, the Freeborn defendants received a retainer fee of $300,000 from Lifeblood for legal fees. Then, on October 14, 1998 Sabian and Poyfair learned that Mann had been indicted for his role in Legend Sports. At about this same time, Sabian learned that Lifeblood had severe financial difficulties and had no source of income to repay its note-holders. The Freeborn defendants helped Lifeblood develop a "script" for note-holders stating that Lifeblood was in negotiations with another company to purchase Lifeblood's assets. The script did not disclose that this same company had earlier rejected a similar deal with Lifeblood. While one of

the scripts may have contained false statements, there is nothing in the record that shows that any of the Freeborn defendants were aware that any information in the scripts was false.

On November 24, 1998 Poyfair first learned from Mann that the bonding companies backing up the promissory notes were phony. Poyfair informed Mann of the criminal implications of his conduct, and advised him to retain criminal counsel. The Freeborn defendants determined that they were ethically bound to withdraw from representing Lifeblood unless Mann turned himself in. The record is not clear precisely when Mann turned himself in.

On December 3, 1998 the Freeborn defendants wired $100,000 of their retainer from Lifeblood to Mann's personal criminal defense lawyer. On July 29, 1999 the Freeborn defendants disbursed almost $30,000 of these funds directly to Mann. In March of 2000, the Freeborn defendants transferred more than $123,000 of the remaining Lifeblood funds to Poyfair's new law firm, Snell & Wilmer. About $69,000 was retained as legal fees by Freeborn and Peters.

## II.  STANDARD OF REVIEW

The Freeborn defendants move for summary judgment under Fed.R.Civ.P. 56. Sender also brings his motion as a motion for summary judgment, but the motion implicates a motion to strike under Fed.R.Civ.P. 12(f), and a motion for judgment on the pleadings, under  Fed.R.Civ.P. 12(c). Since all of the Freeborn motion and most of the Sender motion is presented under Rule 56, that standard is set out here. The standards of review relevant to Sender's arguments that are not motions for summary judgment are set out below where those specific arguments are addressed.

The purpose of a summary judgment motion is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Id.* at 323;  *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Mares* at 324.

## III.  DISCUSSION

I will address the issues raised in Sender's motion first and then address the issues raised in the Freeborn defendant's motion. Some of the issues in Sender's motion are related to the issues in the Freeborn defendant's motion**.** For example, Sender seeks to strike some of the Freeborn defendants' affirmative defenses as redundant, while the Freeborn defendants argue some of these same defenses as the basis for summary judgment.  In most cases, however, the motions raise distinct legal issues and I therefore treat them separately.

A.    Sender's Motion for Summary Judgment

Unfortunately, Sender's motion for summary judgment conflates Rule 56 with Rule 12(f).

First, Sender moves against certain affirmative defenses plead by the Leone and Freeborn

defendants, not because these arguments are legally invalid, but because they are denials of the

charges and not proper affirmative defenses. Granting Sender's motion on these claims would not

deny to defendants any substantive argument; it would simply, according to Sender, reduce

confusion and redundancy in the pleadings. But the conflation does not reduce the confusion, it

exacerbates it. These "requests," although characterized as a motion for summary judgment, are

more accurately motions to strike. I analyze them accordingly.

Second, Sender moves for summary judgment on some of defendants' substantive

affirmative defenses. Summary judgment on these defenses removes them from the case.

Finally, Sender moves for summary judgment on the Leone defendants' counterclaims.

Sender asserts this motion as a Fed.R.Civ.P. 56 motion for summary judgment or alternatively as

a Fed.R.Civ.P.12(c) motion for judgment on the pleadings.

1.    Summary Judgment on Redundant Affirmative Defenses

Sender seeks summary judgment on several affirmative defenses asserted by the Leone and

Freeborn defendants. Sender argues that these are improper affirmative defenses because they are

mere denials of the elements of specific claims and are, therefore, redundant with these

defendants' denials of the claims. Sender does not seek here to deny defendants the right to assert

these arguments in defense, but only to reduce confusion in the pleadings.

Sender moves against the following affirmative defenses: Freeborn defendants' fourth

affirmative defense, (no attorney-client or fiduciary relationship), Freeborn defendants' fifth

7

affirmative defense (no breach of duties), Freeborn defendants' sixth affirmative defense (no proximate cause), Freeborn defendants' fifteenth affirmative defense (lack of scienter), and Freeborn defendants' sixteenth affirmative defense (lack of knowledge.) Sender moves similarly against the Leone defendant's eleventh affirmative defense (no duties owed during certain periods), twelfth affirmative defense (no proximate cause and/or intervening causation) and sixteenth affirmative defense (insufficient knowledge or scienter.)

An affirmative defense is a pleading, Fed. R. Civ. P. 8(a), and as such is subject to a motion to strike for various reasons, including redundancy. Fed R. Civ. P. 12(f). While Sender's motion is presented as a motion for summary judgment under Rule 56, to the extent that it seeks to strike a pleading, it is more appropriately construed as a Rule 12(f) motion to strike. Motions to strike are a severe remedy, and as such are generally disfavored. *See Federal Deposit Ins. Corp. v. Isham,* 782 F.Supp. 524, 530 (D. Colo. 1992).

An affirmative defense is different from a denial. An affirmative defense is a basis for denying liability even if the facts of a complaint are true, while a denial simply denies the facts of a complaint. *Bobbitt v. Victorian House, Inc.,* 532 F. Supp. 734, 736 (N.D. Ill. 1982). A defendant's denial of an element of an offense is not properly an affirmative defense but a denial. *In re Kmart Corp.,* 318 B.R. 409, 413 (Bkrtcy. N.D. Ill., 2004). Sender contends that these affirmative defenses all rebut one or more elements of the *prima facie* case of a specific claim, and so are denials and not affirmative defenses. Sender argues that since the Freeborn defendants and the Leone defendants have already denied these claims, the affirmative defenses are redundant with the denials and should be stricken.

A defense should not be stricken "if there is any real doubt" about its validity, and "[T]he benefit of any doubt should be given to the pleader." *Bobbitt,* 532 F.Supp. at 736.  Since it is often unclear whether a defendant should properly plead a argument as a denial or a defense, and because a defense not plead is waived, a "cautious pleader" will often err on the side of labeling an argument as a defense. *Id.*  There is no reason to penalize such a mistaken pleading by granting a motion to strike. *Id.*

In addition, there is some authority for the proposition that the federal rules allow a defendant to plead an affirmative defense that is also a denial. *See Best Foods v. General Mills,* 59 F.Supp. 201, 203 (D.C. Del. 1945), *Chasan v. Mutual Factors,* 3 F.R.D. 477, 478 (S.D.N.Y. 1943), *Allegheny County Sanitary Authority v. U.S. E.P.A.,* 557 F.Supp. 419, 426 (W.D. Pa. 1983).  Most important, "[R]edundant allegations need not be stricken if their presence in the pleading cannot prejudice the adverse party." *Id.*

Sender makes no showing that he will be prejudiced or harmed if I allow the defendants to maintain these affirmative defenses, even if they may be redundant with their denials. Sender suggests that striking these defenses will "streamline" the jury instructions and trial in this case, but does not in fact show how granting this motion will do so. In any event, any potential ambiguity can be addressed during the drafting of jury instructions.

I therefore deny Sender's motion for summary judgment as to the Freeborn defendants fourth affirmative defense (no attorney client or fiduciary relationship), fifth affirmative defense (no breach of duties), sixth affirmative defense (no proximate cause), fifteenth affirmative defense (lack of scienter), and sixteenth affirmative defense (lack of knowledge.) I also deny Sender's motion as to the Leone defendants' eleventh affirmative defense (no duties owed), twelfth

affirmative defense (no proximate cause and/or intervening causation) and sixteenth affirmative defense (insufficient knowledge or scienter.)

> 2.    Summary Judgment on Affirmative Defense of Failure to State a Claim

Sender seeks summary judgment on the Leone defendants' eight affirmative defense and the Freeborn defendants' first affirmative defense, both asserting that Sender's complaint fails to state a claim for relief. Sender argues that since this Court has denied motions from both defendants to dismiss the complaint for failure to state a claim for relief under Fed.R.Civ.P. 12(b)(6), as a matter of law this Court has also rejected this argument as an affirmative defense.

Defendants argue that this affirmative defense preserves their right to challenge Sender's standing and to argue on summary judgment that Sender has failed to prove his claims. This is unpersuasive, since defendants' right to make these arguments is unrelated to retaining the affirmative defense of failure to state a claim *See Walker v. Thompson,* 288 F.3d 1005, 1008 (7th Cir. 2002) ("A failure of proof is not a failure to state a claim.")

However, for the reasons discussed above, I nevertheless decline to strike these affirmative defenses.   Sender has put forward no evidence or argument showing that this redundant pleading will cause confusion, harm or prejudice. I therefore decline to strike the Leone defendants' eighth affirmative defense and the Freeborn defendants' first affirmative defense.

> 3.    Summary Judgment on Freeborn Defendants' Defenses 23, 24 and 25.

Sender seeks summary judgment on the Freeborn defendants' affirmative defenses 23, 24 and 25. The Freeborn defendants have already withdrawn defenses 24 and 25, so this portion of Sender's motion addresses only defense 23. The Freeborn defendants assert as affirmative defense 23 that punitive damages must be proven beyond a reasonable doubt to meet constitutional

10

requirements. Sender asserts that the burden of proof on punitive damages is an inappropriate affirmative defense. (The Freeborn defendants seek summary judgment on the substance of punitive damages, discussed below.) Again, Sender seems to rely on pleading technicalities to support this motion. He does not show how this pleading either confuses this issue or causes him prejudice. For these reasons, I decline to strike this defense.

    4.       Judgment as a Matter of Law with Respect to Affirmative Defenses.

        a.      Statute of Limitations

Sender brings claims against the Freeborn defendants and the Leone defendants both on behalf of Lifeblood and on behalf of the note-holders. Sender is currently asserting the following claims on behalf of Lifeblood against the Freeborn and Leone defendants: aiding and abetting breach of fiduciary duty (Claims 6 and 7), breach of fiduciary duty (Claims 13 and 14), legal malpractice (Claims 16 and 17), actual fraudulent transfer (claim 33) and constructive fraudulent transfer (claim 34).

Sender is currently asserting the following claims on behalf of the creditors against the Freeborn and Leone defendants: aiding and abetting fraud (claims 2 and 3), aiding and abetting breach of fiduciary duty (claims 10 and 11), violating COCCA (claims 30 and 31), and conspiracy (claim 35). I note that the list of claims and the claim numbers used by the parties does not seem to correspond precisely with the claims as listed in the Second Amended Complaint. I rely on the claims and claim numbers listed in the Second Amended Complaint.

The Freeborn and Leone defendants assert the affirmative defense that all of these claims are time-barred, except for the fraudulent transfer claims. Sender and the Freeborn defendants have both submitted summary judgment briefs on this issue. Sender seeks summary judgment that

these claims are timely (Docket # 455), while the Freeborn defendants seek summary judgment that these claims are time-barred. (Docket # 500).  The arguments in these motions are essentially the same, so I examine them together.  Because the timeliness issues are somewhat different for Sender's claims on behalf of the creditors and on behalf of the debtors, I evaluate them separately.

i.      Sender's Claims on Behalf of Lifeblood

Sender makes two basic arguments as to support the timeliness of his claims. First, Sender argues that he filed his complaint within the statutory time periods for each claim. Each of these claims has a statutory time period of two years (legal malpractice) or three years (aiding and abetting breach of fiduciary duty and breach of fiduciary duty.)

In addition, Sender contends that the bankruptcy code, 11 U.S.C. § 108(a)(2) extends the statute of limitations for an additional two years from when the bankruptcy action was brought. Here, the bankruptcy petition was filed July 26, 2000, and Sender filed his complaint November 30, 2001, less than two years later. This means that any claim that "accrued" two or three years prior to July 26, 2000 (depending on the claim) is timely.  In Colorado, a cause of action accrues "when the injury, loss, damage or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence." Col. Rev. Stat. § 13-80-108.  Accordingly, Sender's claims are timely if the corporation did not know or should not have known about the injury giving rise to these claims until after July of 1998 or July of 1997, depending on the claim.

The Freeborn defendants do not dispute that the bankruptcy code extends the statute of limitations, and also do not argue that these claims accrued within this extended statute of limitations. Instead, the Freeborn defendants present other arguments as to why these claims are

12

barred, such as the doctrine of *in pari delicto* and that the trustee may not assert these claims

against third parties. However, these arguments do not address the issue of statute of limitations,

and are addressed elsewhere in this order. I therefore conclude there is no material fact in dispute

that Sender's claims on behalf of the debtor are timely.

The Leone defendants also do not specifically address the statute of limitations issue. They

argue that the acts they are accused of committing that form the basis of Sender's claims occurred

outside of the limitations period, but they do not address the relevant issue of when the plaintiffs

could reasonably have become aware of their injuries from these acts. Since the Leone defendants

do not provide a factual basis to question Sender's assertions, they do not raise an issue to defeat

summary judgment.

I therefore conclude that Sender's claims against the Freeborn defendants and the Leone

defendants, on behalf of the debtor, Lifeblood, are timely, and that these defendants' defenses of

statute of limitations fail as a matter of law.

ii.     Sender's Claims on Behalf of the Creditors/Note-holders

Sender also alleges several claims against the Freeborn and Leone defendants on behalf of

the creditors. The claims, and their relevant statute of limitations, are as follows: aiding and

abetting fraud, three years, Col. Rev. Stat. § 13-80-102(1), aiding and abetting breach of fiduciary

duty, three years, Col. Rev. Stat. § 13-80-102(1), violating COCCA, two years, *F.D.I.C. v. Refco

Group Ltd.,* 989 F.Supp. 1052, 1078 (D. Colo. 1997) and conspiracy, two years. *Stump v. Gates,*

777 F.Supp. 808, 823 (D. Colo. 1991).

Bankruptcy law does not extend the statute of limitations on these claims because the

applicable section of the code only extends the filing period for claims that could have been

brought by the debtor, in this case Lifeblood. *In re Dry Wall Supply, Inc.,* 111 B.R. 933, 935 n.2 (D. Colo. 1990). Since Sender's claims on behalf of the Opt-in trust were assigned to him after the date of the bankruptcy petition, the extended statute of limitations does not apply to these claims. *See In re Ward.* 42 B.R. 946, 950 (Bkrtcy. M.D. Tenn. 1984).

So the inquiry for these claims is whether they accrued within the statutory period prior to Sender's filing his complaint November 30, 2001. The Freeborn defendants argue that the note-holders were aware of the fraud perpetrated against them no later than November of 1998 and so all of these claims were filed outside of the statutory filing period. The record shows that the note-holders stopped receiving interest payments on their notes in mid 1998, started raising questions about the validity of the bogus bonding companies by early October 1998 and, by their own testimony, knew no later than early November of 1998 that Lifeblood was a fraud.

Sender, citing *First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.,* 744 P.2d 1197, 1200 (Colo. Ct. App. 1987), contends that equitable tolling principles render his claims timely because Mann and Wells concealed material information preventing the note-holders from bringing their claims earlier. However, *First Interstate* also holds that even where a statute of limitations is tolled due to fraudulent concealment, it is tolled "only so long as the plaintiff is unable, by reasonable diligence, to discover the facts necessary for determining the existence of a claim for relief." *Id.* at 1201. Sender contends that due to the defendants' fraudulent concealment, the creditors, even "exercising reasonable diligence" could not have "discovered the existence of facts forming the basis for the claim for relief" until the appointment of a Chapter 11 Bankruptcy trustee in October 2000.  If, on the other hand, the creditors were on notice of facts alerting them to their claims prior to the statutory period, then equitable tolling is unavailing despite the fraud

14

perpetrated by Mann and Wells.

This is precisely what the Freeborn defendants demonstrate. They identify evidence in the record showing that the note-holders were aware no later than November of 1998 of the fraud being perpetrated by Mann. The note-holders testified that by early November 1998 "[E]verybody in the world knew this was a fraud."  While the note holders may not have known specifically who was responsible for their losses from the ponzi scheme, "it is not necessary" for the plaintiff to know "the specific acts of the alleged negligence by this defendant" or the "details of the facts necessary to prove the claims against this defendant." *Grogan v. Taylor,* 877 P.2d 1374, 1379 (Colo. Ct. App. 1993). "It is enough that the plaintiff knew, or may be reasonably charged with knowledge of, sufficient facts to be aware that a claim existed." *Id.  See also Yoder v. Honeywell, Inc.,* 900 F. Supp. 240, 247 (D. Colo. 1995) (holding that a statute of limitations begins to run "when the injury and its cause are known" even "where the identity of the defendant is not readily ascertainable.")

There can be no genuine dispute here that the note-holders were aware that they had not received their interest payments by mid 1998 and were aware that the promissory notes "were a fraud" as of November of 1998. They thus were aware they had been injured, and were aware that they had been injured by a fraudulent promissory note scheme. This is sufficient to place them on notice and for the statute of limitations to accrue under Colorado law. I therefore conclude that Sender's claims against the Freeborn defendants and the Leone defendants on behalf of the note-holders are time barred.

b.      Laches, Waiver and Estoppel

Sender seeks summary judgment on the Freeborn defendants' defense of laches. (Freeborn defendants' defense 20 and Leone defendants' defense 14). The Freeborn defendants state in their response brief that they withdraw this defense, and the Leone defendants do not address this issue.

Sender also seeks summary judgment on the defendants' affirmative defenses of waiver and estoppel. Sender argues that since his claims were filed within the statutory period the defense of estoppel is inapplicable, citing *In re Bloch,* 207 B.R. 944, 949 (D. Colo. 1997). The Freeborn defendants do not address this issue in their brief. I agree that Sender cannot be estopped from pursuing those claims that are timely.

Likewise, Sender asserts that the Freeborn and Leone defendants cannot assert waiver as a defense. Citing *Hoffman v. Heritage Sav. & Loan Ass'n (In re Garrison),* 48 B.R. 837, 841 (D. Colo. 1985), Sender contends that defendants have not provided evidence of the elements of waiver, "actual or constructive knowledge of the right, privilege or benefit being waived and intentional relinquishment of that right, privilege or benefit," *id.,* and so cannot show that Sender, acting for the debtor, waived his rights. The defendants do not address this claim, and so I conclude that this defense also fails.

c       Unclean Hands

Sender seeks summary judgment on the defendants' defense of unclean hands (the Freeborn defendants' affirmative defense thirteen and the Leone defendants' affirmative defense six). The doctrine of unclean hands prevents "one who has engaged in improper conduct regarding the subject matter of the cause of action," to pursue the claim at issue. *Salzman v.*

16

*Bachrach,* 996 P.2d 1263, 1270 (Colo. 2000). It applies only to equitable remedies. *Id.* The

defendants argue that their unclean hands defense is valid because Sender's two claims for

fraudulent conveyance are equitable claims under Colorado law. *Ciccarelli v. Guaranty Bank,* 99

P.3d 85, 88 (Colo. Ct. App. 2004) ("Fraudulent transfer claims are equitable in nature.") *See also*

*Morris v. Askeland Enterprises, Inc.,* 17 P.3d 830, 832 (Colo. Ct. App. 2000).

Sender contends that since he is only seeking money damages, his claims are legal and not

equitable under the doctrine of *Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 48-49 (1989).

*Granfinanciera,* examining a fraudulent conveyance claim in a bankruptcy proceeding, held that

when a claim can be satisfied by a money payment it is in fact a claim for legal relief even if the

claim traditionally would be equitable and even if it uses the semantics of equity. *Id.* at 49 n.7.

Sender argues that since his fraudulent conveyance claim can be satisfied by a money payment, it

is a legal remedy  under *Granfinanciera.*

I disagree. Sender brings his claim for fraudulent conveyance  under state law and under

11 U.S.C. 544(b), which gives the trustee authority to avoid transfers under applicable state law.

*Granfinanciera*, by contrast, was a core bankruptcy proceeding and did not involve state law

claims. Unlike the Supreme Court in *Granfinanciera,* I can look to state law to define the nature

of this claim, and it defines fraudulent conveyance as an equitable remedy. *Ciccarelli,* 99 P.3d at

88.

*Granfinanciera* is also distinguishable because it analyzed a constitutional right to a jury

trial, not the validity of an affirmative defense. There is no question that the right to a jury trial in

federal courts is a matter of federal, and not state law. *Simler v. Conner,* 372 U.S. 221,222

(1963). But *Granfinanciera* did not hold that its methodology should displace state law

definitions of equitable claims when a jury trial right is not at issue.  This conclusion is reinforced by the fact that Colorado courts since *Granfinanciera* have used Colorado state law definitions of equitable remedies even when the claim could have been satisfied by money damages. *See Salzman,* 996 P. 2d at 1269. Sender's argument would have me extend the doctrine of *Granfinanciera* even where constitutional rights are not at issue, and even where state law definitions of equitable remedies otherwise apply. I decline to do this.

Sender, citing *The Personal Bus. and Ins. Agency v. PFS,* 334 F.3d 239, 246 (3d Cir. 2003), also suggests that equitable defenses such as unclean hands do not apply to claims brought by a bankruptcy Trustee, since the Trustee should not be tainted by the malfeasance of the debtor. However, the Tenth Circuit has rejected this argument. *In re Hedged Investments Associates, Inc.,* 84 F.3d 1281, 1285 (10th Cir. 1996). Sender's motion as to the defense of unclean hands is denied.

> d.    Freeborn Defendants' Fraud/Illegality defense

Sender argues that the Freeborn defendants' defense of fraud and/or illegality (defense fourteen) is barred as a matter of law. Sender argues that the defense of fraud is only available in contract claims, not in a tort or COCCA claims. The Freeborn defendants respond with cases that assert that fraud or illegality can be the basis for the defense of *in pari delicto*. Sender does not dispute these cases, or that *in pari delicto* is applicable to his claims. Instead, he contends that since the Freeborn defendants plead *in pari delicto* as a separate defense, it cannot rescue their defense of fraud or illegality. Put differently, Sender argues that the alleged fraudulent or illegal acts of Lifeblood may be a defense via the doctrine of *in pari delicto*, but not a defense under the doctrines of fraud or illegality.

I address the substance of the issue of *in pari delicto* in the section on standing, below. The debate here seems merely over whether the Freeborn defendants can retain the defenses of fraud and illegality if they are alternative or redundant with the defense of *in pari delicto*. Sender has, again, not shown how such a defense harms or prejudices him. I decline to grant Sender's motion as to this defense.

> e.   Leone Defendants' Defense of Failure of Consideration, Good Faith Reasonable Belief, Duty to Mitigate, No Privity and No Legal Opinion

Sender argues that the Leone defendants' affirmative defenses of failure of consideration (defense four), good faith reasonable belief, (defense one),  non-privity (defense three), duty to mitigate (defense nine) and no legal opinion (defense five) are inapplicable to this case.

Sender contends that there is no authority suggesting that "good faith reasonable belief" is a defense to any of the claims against the Leone defendants. However, as discussed below, actual knowledge of wrongful conduct is an element of aiding and abetting in Colorado. The Leone defendants may be able to show that they acted in good faith and did not know of Mann and Well's illegal activities. This is sufficient to sustain this defense. Sender contends that "no legal opinion" is not a defense at all but merely a denial of Sender's claim. As discussed above, I will not strike a defense, absent a showing or prejudice, simply because it is redundant with a denial.

The Leone defendants' defenses of no privity and no consideration concern their central contention that the legal memoranda that form the basis for several of Sender's claims against them was in fact stolen, and so they cannot be liable for any actions Lifeblood may have taken in reliance on this document. While Sender asserts that these defenses are irrelevant to his claims, if the Leone defendants can show that this document was stolen from them, it potentially defeats

19

several of Sender's claims. This is sufficient to render these defenses relevant to this case.

Sender asserts that none of his claims are subject to a duty to mitigate. The Leone defendants do not respond to this argument. However, Sender offers no authority or argument for this point beyond the mere assertion that he has no duty to mitigate. I decline to grant Sender's motion on such a paltry record.

f.    Ordinary Course defense

The defendants assert as a defense against Sender's claims of fraudulent conveyance, that they conducted these transactions in the ordinary course of business. Sender contends that this defense is inapplicable to these claims as a matter of law.

Sender asserts claims for fraudulent conveyance under both 11 U.S.C. § 544 and 11 U.S.C. § 550 of the bankruptcy code, as well as state law. Section 544(b) gives the trustee the authority to avoid any transaction avoidable under applicable state law. *In re Charles,* 323 F.3d 841, 843 (10th Cir. 2003). Section 550 gives the Trustee the authority to recovery property that is voidable through some other section of the bankruptcy law. 11 U.S.C. § 550(a). *See also In re Deprizion,* 874 F.2d 1186, 1195 (7th Cir. 1989).

The Freeborn defendants argue that the ordinary course defense applies to actions brought under § 550, citing *In re Meredith Hoffman Partners,* 12 F.3d 1549, 1555 (10th Cir. 1993). While that decision contains language suggesting that the ordinary course defense is available under § 550, the language quoted by the Freeborn defendants in fact refer to a recovery brought in an avoidance action under § 547. *Id.* The Freeborn defendants cite no authority, and this court is not aware of any, stating that the ordinary course defense applies to recoveries under § 550. If this defense is available, it must be available for the underlying avoidance action that is the

20

predicate to a § 550 recovery action. Here, the bankruptcy authority for avoidance actions Sender

invokes, § 544(b), gives the trustee the authority to avoid fraudulent actions under state law. So,

this analysis reduces to whether the ordinary course defense is available under any state law or

common law causes of action for fraudulent transfer.

Sender's claims 33 and 34 both invoke the Colorado Uniform Fraudulent Transfer Act

("CUFTA"), Col. Rev. Stat. § 38-8-101 *et seq.*, as well as "other applicable fraudulent transfer

law and the common law." Sender argues, correctly, that the ordinary course defense is only

available under CUFTA to insiders, and the defendants do not fit any of the statutory categories

of insiders, Col. Rev. Stat. § 38-8-101(8). The defendants do not contest this point.

However, the Freeborn defendants point out, correctly, that actual intent is an element of

at least one of Sender's fraud claims. Col. Rev. Stat. § 38-8-105(1)(a). The Freeborn defendants

contend that evidence that their transactions were in the ordinary course of business may negate

an element of actual fraudulent transfer. *See RTC Mortg. Trust 1995-S/NI v. Sopher,* 171 F. Supp.

2d 192, 201 (S.D.N.Y. 2001)(analyzing New York Fraudulent Transfer law.) In essence, the

Freeborn defendants argue that even if ordinary course is not a formal defense, it is an argument

that may rebut this claim. I agree. For this reason, I decline to grant Sender's motion as to this

defense.

g.     Freeborn "Collateral Sources" defense

Sender seeks summary judgment on the Freeborn defendants' defenses of collateral

sources (21st defense) and offset under Col. Rev. Stat. § 13-21-111.6 (22nd defense). These two

defenses are substantively identical. Both defenses assert that Senders' damages must be offset by

any payments he receives from other sources. By stating this argument in two different defenses,

the Freeborn defendants argue both a statutory and a common law collateral sources defense.

Since in Colorado, the statutory collateral sources rule displaces the prior common law rule, *see*

*Van Waters & Rogers, Inc., v. Keelan,* 840 P.2d 1070, 1076 (Colo. 1992), the 21st defense is not

based on a valid legal theory. The Freeborn defendants seem to concede this point, by stating that

they are in fact relying wholly on the statute. I therefore grant Sender's motion as to the 21st

defense.

The only real issue is whether Sender is entitled to summary judgment on the Freeborn

defendants' invocation of the statutory collateral source defense.    Sender asserts that he has

accounted for all contributions he has received from collateral sources, and these have been

factored into his damages calculation. Therefore, he asserts, there is no factual dispute regarding

the amount of damages he is entitled to, and no justification for the collateral sources defense.

Sender points to his calculation of damages dated October 31, 2003 showing that he has

recovered $1,199,642.

However, the Freeborn defendants dispute this calculation, submitting a calculation of

funds showing that Sender has recovered $1,216,907.64, an amount that diverges from Sender's

claimed recovered funds by about $17,000.00. Moreover, Sender has provided an updated report

May 4, 2005 reporting recovery of additional funds. Since the Freeborn defendants dispute the

amount Sender has recovered and since Sender continues to recover additional funds as this case

proceeds it is inappropriate to declare at this time that Sender has already incorporated into his

claim for damages all of the funds he has recovered. Accordingly, the Freeborn defendants may

continue to assert this defense under the statutory collateral sources rule.

h.      Leone Counterclaims

Sender moves for summary judgment on all of the Leone defendants' counterclaims against Sender in his capacity as Trustee of Lifeblood. These counter-claims are: 1) ponzi scheme, 2) unregistered notes, 3) false insurance bond, 4) unregistered insurance bonds, 5) common law frauds, 6) thefts, 7) causing or assisting breaches of lifeblood entities' duties, 8) causing or assisting selling agents' wrongdoing, 9) creditors' liabilities for fraudulent transfers, 10) creditors' liabilities for negligent due diligence.

Sender puts forward several arguments for summary judgment, or, in the alternative for judgment on the pleadings under Fed. R. Civ. P. 12(c). First, Sender contends that the counterclaims are barred by the Proponents' First Amended Joint Plan of Liquidation for the Debtors of March 5, 2001 ("the Plan,") and the Order Confirming the Plan of June 11, 2001 ("the Confirmation Order.") The Plan states on page 11, Article VIII, that "Upon confirmation all creditors and equity security holders of the Debtors are permanently enjoined from commencing or pursuing any action against the Chapter 11 Trustee, the Liquidation Trustee, the Opt-in Trustee, the Creditors' Committee, the Liquidation Trust, or the Opt-In Trust other than an action to enforce the provisions of this Plan." Moreover, upon confirmation the plan binds "the Debtors, the Chapter 11 Trustee and any creditor or equity security holder of any of the debtors. . . whether or not such Person has accepted this Plan."   This language is very similar to the language of 11 U.S.C. § 1141(a). The Leone defendants do not respond to this argument.

Sender also argues that the Leone defendants assert these counter-claims under the underlying legal theory of contribution, but that under Colorado law contribution is not available. Col. Rev. Stat. § 13-50.5-104 authorizes contributions among tortfeasors, but is silent regarding

23

contributions against a plaintiff by a counter-claim defendant. Citing *Greenmeier by Redington v. Spencer*, 694 P.2d 850, 852 (Colo. Ct. App. 1984), Sender argues that contribution addresses recovery by one tortfeasor against another and "has nothing to do with the rights of the injured party to recover from the tortfeasors." *Id.* The Leone defendants do not respond to this argument either.

Sender's arguments are persuasive. Because the Leone defendants' counterclaims are barred by the Order, and because the Leone defendants cannot seek contribution in a counterclaim as a counter-claim defendant, I grant summary judgment to Sender. The Leone counter-claims are dismissed.

B.   The Freeborn Defendants' Motion for Summary Judgment.

The Freeborn defendants move for summary judgment on all claims against them, arguing that Sender lacks standing to bring these claims, aiding and abetting fraud is not a cognizable claim in Colorado, Sender lacks facts to support elements of his claims and there are no facts to support punitive damages or pre-judgment interest. I will address each argument in the Freeborn defendants' motion, below.

1.   Standing

A bankruptcy trustee's standing to bring a claim on behalf of the debtor estate must derive from the bankruptcy code. *Sender,* 84 F.3d at 1303-1304 (10th Cir. 1996). Here, Sender asserts claims under 11 U.S.C. § 541 for injuries directly to Lifeblood, and asserts claims under 11 U.S.C. § 544 for injuries to the creditors. When a Trustee chooses to act under § 544, "the trustee may invoke [the] state law remedies provided to judgment lien creditors to satisfy judgments against the debtor." *Zilkha Energy Co. v. Leighton,* 920 F. 2d 1520, 1523 (10th Cir.

24

1990). Section 544 enables the trustee to "stand in the shoes of a debtor to set aside transfers to third parties" and "to assume the guise of a creditor with a judgment against the debtor." *Id.* In addition to this authority conferred by the bankruptcy code, Sender also claims standing to bring the individual claims of the note-holders/creditors as the assignee of their claims.

The Freeborn defendants contest Sender's standing on multiple grounds. The Freeborn defendants argue first that Sender lacks standing to bring claims on behalf of Lifeblood because it is undisputed that the Lifeblood entities are "sham corporations," without property. Lifeblood therefore cannot suffer an injury, which is the essential constitutional minimum requirement of standing. The Freeborn defendants rely on *Feltman v. Prudential Bache Securities*, 122 B.R. 466, 473-474, (S.D. Fla. 1990), where a Chapter 11 trustee tried to bring an action against bankers and accountants for their tortious mis-conduct in aiding and abetting the principal of a fraudulent corporation. The court ruled that the Trustee lacked standing to sue on behalf of the debtor corporation, because the debtor corporation was "simply fictitious," a "sham" corporation "with no separate identity" from the corporate promoter and embezzler. *Id.* "Thus, any alleged injury to the debtors is as illusory as was their corporate status." *Id.*

Sender responds that even sham corporations are treated by law as separate entities with separate interests. Relying on *Scholes v. Lehman,* 56 F.3d 750, 754 (7th Cir. 1995), Sender argues that in this ponzi scheme, even assuming that Lifeblood was simply the "evil zombie" of Mann and Wells (borrowing the language of *Scholes*), Mann and Wells removed assets from the corporation that should have been used for the company's stated purposes of medical research. In this way, the corporation was harmed. While *Scholes* analyzed a receivership rather than a bankruptcy trustee, Sender argues that it is analogous.

25

I agree. The reasoning of the Seventh Circuit is persuasive that even sham corporations may have interests separate from their promoters.  I therefore conclude that even a sham corporation may suffer an injury cognizable for the purpose of standing.

The Freeborn defendants argue next that Sender lacks standing to bring claims against them because the doctrine of *Caplin v. Marine Midland Grace Trust,* 406 U.S. 416 (1972) bars suits by a trustee against third party defendants. In *Caplin,* a bankruptcy trustee attempted to pursue claims of note holders against their representative for failing to fulfill his contractual obligation to ensure the debtor's compliance with the indenture agreement. *Id.* at 418-419.

The *Caplin* court found that the trustee lacked standing to bring these claims for several reasons. First, there was no explicit authority in the bankruptcy code allowing the Trustee to bring the claims of individual creditors against third parties. Second, the debtor there could not bring suit against the third party because the debtor was itself complicit in the misconduct and was thus *in pari delicto* with the indenture trustee. Third, the trustee's action would potentially conflict with independent claims of the individual creditors, leading to proliferation of lawsuits and potentially inconsistent claims against the third party. *Id.*

Sender argues first that *Caplin* does not apply to his claims on behalf of the debtor corporation, which are distinguishable from the claims in *Caplin* which belonged to the creditors. Sender asserts, correctly, that a trustee may bring claims against third parties that are based on injuries to the debtor corporation and not to the creditors. In *Drabkin v. L & L Construction Associates, Inc.*, 168 B.R. 1, 5 (Bkrtcy. D. Colo. 1993) the court distinguished between claims directly on behalf of depositors in a ponzi scheme, for which the trustee lacked standing, and claims for looting and stealing from the corporation, for which the trustee had standing. The key

issue in this standing analysis is whether the trustee alleges distinct harm to the debtor and not just harm to the creditors. *See In re Plaza Mortg. and Finance Corp.,* 187 B.R. 37, 44 (Bkrtcy. N.D. Ga. 1995). There is no question here that Sender's claims on behalf of Lifeblood are based on allegations of specific harm to Lifeblood, not harm to the creditors.

Sender argues also that *Caplin* does not bar his claims on behalf of the creditors because the beneficiaries of the Opt-In Trust have assigned their claims to him, so that he is representing these claims on behalf of the entire estate and not on behalf of the individual creditors. *See In re Bogdan*, 414 F. 3d 507, 512 (4th Cir. 2005). The absence of bankruptcy act authority is no longer relevant, since the claims are now part of the estate by virtue of assignment. Similarly, the assignment of claims to Sender obviates the concern about multiple and inconsistent litigation, since only Sender may bring these claims under the terms of the assignment. Because this unconditional assignment transforms the opt in trust claims from individual claims to claims of the estate, the note-holders will recover, if at all, only to the same degree as any other creditor by sharing whatever assets the Trustee collects on behalf of the estate. *Id.* While the court in *Caplin* held that the note-holders could best decide for themselves how to pursue their claims against the indenture trustee, the note holders here have "affirmatively elected how best to deal with their claims" against the Freeborn defendants. *Id.*

The Freeborn defendants argue that the assignment here does not rule out duplicative litigation, since some note holders have already filed suits. However, these suits are against the Lifeblood entities, not against the Freeborn defendants. While the Freeborn defendants contend that these suits will nevertheless impact the note-holders' ability to recover, this means only that any recovery for such a note-holder will be reduced; it does not relate to the threat of inconsistent

27

litigation against the Freeborn defendants.

Sender also contends that § 544 gives him standing to bring derivative claims on behalf of the note-holders as creditors of the estate.  Sender argues that § 544, despite *Caplin*, enables him to "invoke any remedies provided by state law to judgment lien creditors to satisfy judgments against the debtor." *Zilkha Energy Co.,* 920 F.2d at 1523.   Under Colorado law, judgment lien creditors have the right to pursue all claims available to a debtor corporation before bankruptcy was declared. *In re Porter Macleod,* 231 B.R. at 793. Sender contends that this authority extends to tort claims against third parties, such as the Freeborn defendants. *Id.*  I agree that Sender has standing under § 544 to bring the derivative claims of the creditors.

The final *Caplin* factor is the extent to which a claim against a third party implicates the doctrine of *in pari delicto. In pari delicto* is defined as "in equal fault" or "equally culpable or criminal." *Id.* The doctrine asserts the principle that a participant in illegal, fraudulent or inequitable conduct cannot recover from another participant in that conduct. *Id.* "The law will aide neither but rather, will leave them where it finds them." *Id.* This doctrine applies to claims a bankruptcy trustee brings as a debtor, but not as a representative of creditors, since creditors are not culpable for the misconduct of the corporate entity. *Id.* This doctrine therefore does not bar Sender's claims brought on behalf of creditors, either by assignment or under the authority of § 544.

However, *in pari delicto* generally bars a Trustee from bringing claims on behalf of a debtor acting under § 541 against a third party in a ponzi scheme situation. *Sender,* 84 F. 3d at 1307. Sender argues that the malfeasance of Mann and Wells should not be imputed to Lifeblood in this case under the "adverse interest"exception to the general rule of imputation. *See Vail Nat'l*

*Bank v. Finkelman,* 800 P.2d 1342, 1344-45 (Colo. Ct. App. 1990). However, this argument ignores the exception within this exception that imputes the wrongdoing of the principals even when they act adversely to the corporation when they are the "sole actors," of the corporation; that is, where the adverse actor is the "sole representative" of the corporation or is the corporation's "alter ego." *Id.* at 1345. Here, Sender's expert report states that Lifeblood was "controlled" by Mann and was Lifeblood's "primary owner." Sender's complaint refers to Lifeblood as "under the control of Mann and Wells." (Second Amended Comp. at ¶ 41.)

However, even assuming that the sole actor doctrine applies, I decline to bar Sender's claims in his capacity as debtor under *in pari delicto.*  Where a trustee brings claims under § 541 against a defendant for participation in a ponzi scheme, it is important to distinguish between claims that the defendant participated in the ponzi scheme itself, and claims that the defendant acted outside of the ponzi scheme to steal from or loot the corporation. *Drabkin*, 168 B.R. at 5. Direct participation in the ponzi scheme is imputed to the debtor and barred by *in pari delicto*, while defendant's mis-conduct that "did not benefit the debtor in any way, but only benefitted the defendants and the debtor's principals" is not. *Id.*

Here, Sender's claims against the Freeborn defendants are not for their participation in the ponzi scheme itself, but for their acts injuring the corporation that occurred after and outside of the ponzi scheme. The ponzi scheme ended in 1998, while the actions of the Freeborn defendants that are the basis for Sender's claims occurred no earlier than October 1998, when the Freeborn defendants accepted $300,000 in a legal fee retainer from Lifeblood, and later transferred funds to Mann and to other lawyers. The mis-conduct Sender alleges, like that of defendants in *Drabkin,* only benefitted the defendants and Mann and Wells, not Lifeblood. The harm alleged is to

29

Lifeblood, and is distinct from the harm caused to the creditors by the ponzi scheme. The debtor corporation is not complicit in this kind of mis-conduct, while it would be complicit in participation in the ponzi scheme that directly harmed the creditors. Accordingly, Sender's claims on behalf of the debtor under § 541 are not barred by *in pari delicto.*

This conclusion is not inconsistent with *Sender.* In that case, the Court ruled that the trustee, under § 541, could not enforce the partnership agreement that was the vehicle for the ponzi scheme to recover money from a ponzi scheme participant. *Sender,* 84 F.3d at 1307. The partnership agreement was "in utter complicity with (the principal's) fraud" and so was imputed to the principal. *Id.* The debtor entity received funds from ponzi scheme participants, and thus benefitted from their involvement. Here, Sender is not trying to enforce the fraudulent ponzi scheme vehicle. And, unlike in *Sender,* the harm alleged here occurred after the collapse of the ponzi scheme and did not benefit Lifeblood. The essential issue is whether the debtor is complicit in the illegal conduct that is the basis for the claim. In *Sender,* the conduct was participation in ponzi schemes through limited partnerships. In *Drabkin* and in this case, the alleged conduct is activity outside of the ponzi scheme that harmed the corporation. Since the corporation is not complicit in this conduct, the doctrine of *in pari delicto* does not apply.

For these reasons, I conclude that Sender has standing to bring these claims.

2.       Statute of Limitations

As I previously determined, Sender's claims on behalf of the debtor, Lifeblood, are timely. But his claims on behalf of the note-holders are time-barred.

3.       Aiding and Abetting Fraud is not cognizable under Colorado law.

The Freeborn defendants argue, briefly, that Colorado law does not recognize the claim of aiding and abetting fraud. For support, they rely on decisions by state courts in North Carolina, *Branch Banking & Trust Co. v Lighthouse Fin. Corp.,* 2005 WL 1995410 at *8 (N.C. Super. July 3, 2005), and Ohio, *Fed. Mgmt. Co. v. Coopers & Lybrand,* 738 N.E. 2d 842, 853 (Ohio App. 2000), holding that aiding and abetting fraud is not cognizable in those jurisdictions.

I find this argument unpersuasive. While Sender does not cite any Colorado authority explicitly recognizing the claim of aiding and abetting fraud, and I am not aware of any, numerous indirect authorities persuade me that Colorado courts would recognize this claim. Colorado broadly recognizes claims of aiding and abetting tortious acts. *Holmes v. Young,* 885 P.2d 305, 308 (Colo. Ct. App. 1994.) In light of *Holmes*, it is reasonable to conclude that fraud is included in the broad category of torts for which aiding and abetting is a cognizable claim. The Freeborn defendants offer no authority and no argument for why Colorado would not recognize aiding and abetting fraud. In addition, in *National Union Fire Ins. Co. v. Kozeny,* 115 F. Supp. 2d 1231, 1236 (D. Colo. 2000), the federal district court in Denver found that aiding and abetting a fraud in Colorado is sufficient to justify personal jurisdiction under the Colorado long arm statute.

I therefore conclude that aiding and abetting fraud is a cognizable claim in Colorado.

4.      Sender's Evidence to Support Essential Elements of His Claims

The Freeborn defendants contend that Sender's claims fail because he has not provided evidence to support the elements of his claims.

a.      Aiding and Abetting

Sender makes claims against the Freeborn Defendants for aiding and abetting fraud (on behalf of the creditors) and aiding and abetting breach of fiduciary duty (on behalf of the creditors

and lifeblood.) Aiding and abetting in Colorado requires that the defendant knowingly participated in the underlying breach or violation. *Nelson v. Elway,* 971 P.2d 245, 249-250 (Colo. Ct. App. 1998). The knowledge element is satisfied if the defendant is "generally aware of his role as part of an overall illegal or tortious activity. . . and knowingly and substantially assists the principal violation. *Holmes v. Young,* 885 P. 2d 305, 308 (Colo. Ct. App. 1994). Wrongful intent is not an element; it is sufficient if the defendant "knew of the breach of duty and participated in it." *Holmes,* 885 P.2d at 309.  However, aiding and abetting requires actual knowledge and is not satisfied by reckless or negligent conduct. *Stat-Tech Liquidating Trust v. Fenster,* 981 F. Supp. 1325, 1339-1340 (D. Colo. 1997).

The Freeborn defendants contend that Sender has presented no evidence that they either knew about Mann and Well's fraudulent activities or that they substantially assisted in their fraud. The evidence Sender alludes to in his response brief shows only that the Freeborn defendants were aware that Lifeblood was having difficulty raising money, the Freeborn defendants helped them form LLPs to assist in fund-raising, Mann had been involved in using LLPs and promissory notes to raise money in the past, and Mann had previously used LLPs as an alternative to promissory notes to avoid regulatory scrutiny. At most, this evidence shows that the Freeborn defendants were aware that Mann and Wells were using promissory notes and LLPs to raise money, not that these activities were fraudulent.

Sender contends that the Freeborn defendants' transfer of funds to Mann and Wells' other lawyers and to Mann personally constitutes substantial assistance to Mann and Wells in their fraudulent effort. I disagree. Establishing the substantial assistance element of aiding and abetting requires that "the secondary party proximately caused the violation, or . . . that the

encouragement or assistance be a substantial factor in causing the tort." *Aetna Cas. And Sur. Co. v. Leahey Const.* Co., 219 F. 3d 519, 537 (6th Cir. 2000). In the context of a $9.3 million fraud scheme and a $77 million damages claim, the amounts at issue in Sender's allegations are not substantial. Sender's evidence shows at most that the Freeborn defendants transferred retainer funds at the request of their client, or in one case transferred funds to Poyfair's new law firm. This is not the substantial assistance necessary to support a claim of aiding and abetting.

I find and conclude that Sender has not asserted facts sufficient to defeat summary judgment on this issue.

c.     COCCA violations

Sender contends that the Freeborn defendants violated numerous sections of COCCA by knowingly receiving proceeds from the Lifeblood entities, Col. Rev. Stat. § 104(1)(a), by assisting in preparing of misleading solicitation materials and other information designed to be transmitted to third parties, Col. Rev. Stat. § 104(3), and by conspiring with Mann and Wells to launder Lifeblood money for Mann and Wells' personal use or to retain such money. Col. Rev. Stat. § 104(4).

i.     COCCA § 104(1)(a)

COCCA § 104(1)(a) states, in relevant part, that "It is unlawful for any person who knowingly has received any proceeds derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest. . . any part of such proceeds . . . in the establishment or operation of any enterprise."  This section of COCCA addresses the use or investment of funds fraudulently obtained, rather than an enterprise's racketeering conduct. *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149-1150 (10th Cir. 1989). Sender argues that the legal fees the Freeborn defendants

received from Lifeblood violate this provision, since they are funds received from a racketeering enterprise, Lifeblood, and invested in another enterprise, Freeborn and Davis.

Sender's claim here fails for several reasons. First, liability under this section attaches only where the defendant has knowingly received proceeds derived from racketeering; there is no such thing as negligent violation of COCCA. Colo. Rev. Stat. § 18-17-104(1)(a). The Freeborn defendants can be liable only if they were aware of Wells and Mann's fraudulent conduct when they received the $300,000 retainer. There can be no genuine dispute that the Freeborn defendants received the retainer in October of 1998 and did not learn that the bonding companies were non-existent until November 24, 1998. This absence of knowledge of the underlying fraudulent activity defeats liability under 104(1)(a).

In addition, to assert a claim under 104(1)(a), Sender must show "a direct causal relationship" between the Freeborn defendants' use of the funds and damage to the note-holders. *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1479 (D. Colo. 1995). It is not enough to show that the note-holders were injured by the racketeering acts of Mann and Wells. *Id.* Sender cannot show this relationship, and so the claim under this section of COCCA fails.

ii.     COCCA § 104(3)

To state a primary violation of COCCA section 104(3), Sender must show that the Freeborn defendants "(1) through the commission of two or more predicate acts (2) which constitute a pattern (3) of racketeering activity (4) directly or indirectly conducted or participated in (5) an enterprise and (6) the plaintiff was injured in its business or property by reason of such conduct." *FDIC v. Refco Group, Ltd.,* 989 F. Supp. 1052, 1074 (D. Colo. 1997).

34

The Freeborn defendants, citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)*,* assert that as outsiders, they did not "participate in the operation or management" of Lifeblood, and thus cannot be liable under § 104(3).  Legal advice and representation is, by itself, insufficient to justify § 104(3) liability. *Seidl v. Greentree Mortgage Co.,* 30 F. Supp. 2d 1292 (D. Colo. 1998).

Sender does not dispute that the Freeborn defendants were outsiders, but responds that indirect involvement in the affairs of an enterprise can be sufficient to support COCCA liability under § 104(3). Citing *FDIC,* 989 F. Supp. at 1075-1076 (D. Colo. 1997), Sender contends that the Freeborn defendants' preparation of scripts for dissemination to investors, payments of funds to Mann's criminal lawyer and to Mann, and to Poyfair at his new law firm, are the kinds of ties that raise an issue of fact as to whether the Freeborn defendants were participating in Mann and Wells' fraudulent enterprise. I disagree.

In *FDIC*, the defendant investment firm had a long-standing relationship with the fraudulent enterprise, was intimately involved in the contractual agreements that were at the heart of the alleged ponzi scheme, and was directly involved in relations between the enterprise and its customers. *Id.* at 1075-1076. The record in that case contained evidence that the defendant was initiating and was intimately involved with the fraudulent conduct. *Id.*  But the circumstances here mirror those in *Reves,* where an accounting firm's routine auditing services to a co-op failed to meet the standards of participation and management. *Reves,* 507 U.S. at 174-176. The role of the Freeborn defendants with Lifeblood does not constitute the kind of participation and management necessary to justify liability under § 104(3).

The Freeborn defendants argue also that they cannot be liable under § 104(3), just as they cannot be liable under § 104(1), if they were unaware that Mann and Wells were engaged in

fraudulent activity. This provides an additional basis for rejecting liability under § 104(3). Sender asserts that the Freeborn defendants were on notice of the fraud before October of 1998, but this is not the standard for COCCA liability. Sender has provided no evidence and, thus, a reasonable jury could not conclude, that the Freeborn defendants actually knew of the fraudulent activity prior to November of 1998. Sender's COCCA claims therefore fail.

iii.    COCCA § 104(4) – Conspiracy

A conspiracy claim under COCCA requires an agreement to a pattern of racketeering activity and an agreement to the statutorily proscribed conduct. *Brooks,* 891 F. Supp. at 1479. "Mere association with conspirators, even with knowledge of their involvement in a crime, is insufficient to prove participation in a conspiracy." *Id.* The Freeborn defendants assert that Sender has produced no evidence that they agreed to participate with Wells and Mann in commission of a crime. I agree. Sender's evidence shows, at most, that the Freeborn defendants were aware that Wells and Mann had difficulties raising money and that their other companies were under regulatory scrutiny. Sender has not produced any fact that shows that the Freeborn defendants entered into an agreement with Mann and Wells to engage in fraud or other illegal activity.  Sender's claim for conspiracy to commit a COCCA violation fails.

d.    Breach of Fiduciary Duty

To recover for a breach of fiduciary duty, a plaintiff must establish that the defendant 1) owed a fiduciary duty to the plaintiff, 2) breached that duty and 3) damages resulted. *Miller v. Byrne,* 916 P. 2d 566, 575 (Colo. Ct. App. 1995). The Freeborn defendants concede that they represented Lifeblood and owed Lifeblood a fiduciary duty, but they contend that Sender has presented no evidence showing a breach of duty, and no evidence showing that damages resulted.

Sender responds that a prima facie case of breach of fiduciary duty is created by the presence of a duty and the transfer or use of trust property by the fiduciary. *In re estate of Heyn,* 47 P.3d 724, 726 (Colo. Ct. App. 2002), *Monday v. Robert J. Anderson, P.C.,* 77 P.3d 855, 857 (Colo. Ct. App. 2003). Here the Freeborn Defendants concede the fiduciary duty and that they transferred Lifeblood's retainer fee. The burden then shifts to the Freeborn defendants to offer some evidence that the transfer was proper. *Heyn*, 47 P.3d at 726. Here, the Freeborn defendants assert that they were unaware of any improper reason for the transfers and that they had a legal and ethical obligation to disburse the money as requested by Mann. However, the Freeborn defendants were aware at the time of the transfer that Mann was likely facing criminal charges for the Ponzi scheme. There are, therefore, facts in dispute as to whether the Freeborn defendants' transfer of the funds was proper. This is an issue for the trier of fact, and prevents summary judgment.

The Freeborn defendants argue as well that even if they did breach a duty, it could not have damaged the note-holders and, thus, the claim for breach of fiduciary duty fails. However, Sender brings this claim on behalf of Lifeblood, not on behalf of the creditors. While the Freeborn defendants contend that the limit of their damages should be the $300,000 purportedly "siphoned" from the corporation, Sender also seeks fees and costs, punitive damages and post-judgment interest. On the basis of the record at this time, I cannot say that in the event Sender proves breach of fiduciary duty, he will be unable to claim more than $300,000 in damages. This claim for partial summary judgment is therefore also denied.

The Freeborn defendants argue that the absence of causation also undermines Sender's malpractice claim, because Sender has not shown harm to the note-holders. However, Sender

filed this claim on behalf of Lifeblood, which was the source of the $300,000 transfer. This is a sufficient showing of possible harm to Lifeblood to defeat summary judgment on this claim.

> e.    Conspiracy

The Freeborn defendants assert that the record does not contain evidence to satisfy any of the elements of conspiracy. In Colorado, the elements of civil conspiracy are: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) an unlawful overt act, and (5) damages as to the proximate result." *Nelson,* 908 P.2d at 106. Sender alleges that the Freeborn defendants conspired with Mann to transfer the retainer fees, which was Lifeblood property, to Mann, and that this invalid transfer proximately damaged Lifeblood.

The Freeborn defendants contend that as a matter of law this is insufficient to constitute conspiracy because an agent cannot conspire with his principal, *Astarte, Inc. v. Pac. Indus. Sys., Inc.,* 865 F. Supp. 693, 708 (D. Colo. 1994), and because Sender has no evidence showing an unlawful act or a meeting of the minds to commit an unlawful act.

There is no question that the Freeborn defendants transferred funds to Mann after they were on notice of the Ponzi scheme. Their client was Lifeblood, not Mann, and so their collaboration with Mann does not constitute an agent-principal relationship.  There is no dispute that the Freeborn defendants and Mann agreed that they would transfer the funds to him, providing the requisite meeting of the minds. The only issue is whether there was an unlawful act.

At the conclusion of this Order the only claims remaining against the Freeborn defendants are for breach of fiduciary duty, legal malpractice and fraudulent transfer, brought on behalf of Lifeblood. While one or more of these claims might provide a predicate for an unlawful act for the

purpose of a conspiracy claim, *see Resolution Trust Corporation v Heiserman*, 898 P.2d 1049, 1056 (Colo. 1995), Sender brings his claim for conspiracy on behalf of the creditors. There is thus no unlawful act remaining in his complaint that can serve as the predicate for a charge of conspiracy. This claim for conspiracy therefore fails.

     5.     Punitive Damages

     In Colorado, punitive or exemplary damages may be awarded where a jury assesses damages for wrongs done to real or personal property and where there is "fraud, malice or willful and wanton conduct." Col. Rev. Stat. § 13-21-102. Willful and wanton conduct is defined as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Col. Rev. Stat. § 13-21-102(b). Claims for punitive damages must be proven "beyond a reasonable doubt." Col. Rev. Stat. § 13-25-127(2).

     The Freeborn defendants argue that Sender's claim for punitive damages fails because he cannot meet this formidable statutory burden of proof and because he has provided no evidence that the Freeborn defendants participated in the ponzi scheme. The "beyond a reasonable doubt" standard applies to punitive damage awards by a jury at trial, not to a summary judgment motion. *See Riva Ridge Apartments v. Robert G. Fisher Co., Inc*. 745 P.2d 1034, 1037 (Colo. Ct. App.1987). So the question before me is not whether Sender can prove he is entitled to punitive damages, but whether he has submitted evidence sufficient to withstand summary judgment.

     The Freeborn defendants contend that Sender fails to meet even the Rule 56 standard because there is no evidence of their involvement in  the ponzi scheme. Even so, the basis for Sender's punitive damages claim is not the ponzi scheme itself but the Freeborn defendants'

acceptance and diversion of legal fees to Mann after they were aware of Mann's unlawful

conduct. I agree with the Freeborn defendants that this conduct does not rise to the level of

malice necessary to support a claim for punitive damages. The Colorado Supreme Court has

defined willful and wanton conduct as "conduct that creates a substantial risk of harm to another

and is purposefully performed with an awareness of the risk in disregard of the consequences. *Tri

Aspen Constr.,* 714 P.2d at 486.

There is no dispute that the Freeborn defendants accepted Lifeblood money and

transferred it to Mann. This alone is insufficient to defeat summary judgment on this claim.

6.      Pre-judgement Interest

Sender's claim for damages includes interest dating from the date of the alleged tortious

act, that is, the Freeborn defendants' acceptance and transfer of the funds it received from

Lifeblood. The Freeborn defendants contend that they are entitled to summary judgment on the

claim for pre-judgment interest. In Colorado, claims for pre-judgment interest absent an

agreement to pay it, is statutory. *South Park Aggregates, Inc., v. Northwestern Nat'l Ins. Co.,*

847 P.2d 218, 226 (Colo. Ct. App. 1992). It is limited to circumstances where money or property

have been "wrongfully withheld," and the interest shall be "an amount which fully recognizes the

gain or benefit realized by the person withholding such money or property." Col. Rev. Stat. § 5-

12-102(a). The Freeborn defendants contend that the undisputed facts show that they did not

wrongfully withhold any funds from note-holders, so they cannot be subject to prejudgment

interest. *See Messler v. Phillips,* 867 P.2d 128, 136 (Colo. Ct. App. 1993).

Sender responds that the Freeborn defendants' liability for pre-judgment interest stems not

from withholding money from note-holders under the ponzi scheme, but from receiving and

transferring Lifeblood funds. Under this theory, the Freeborn defendants are the party receiving the money and did potentially benefit from it. I therefore conclude that summary judgment is inappropriate on this claim.

The Freeborn defendants argue in the alternative that they can be subject to prejudgment interest only on the amount of funds they actually received in legal fees, which they claim is $69,003. It is unclear at this stage of the proceeding which portions of the funds they received from Lifeblood were received or transferred unlawfully. I therefore decline to limit pre-judgment interest to only the $69,003 the Freeborn defendants received in legal fees.

It is Therefore ORDERED that:

1) Sender's motion for summary judgment, (Docket #455), construed in part as a motion to strike, is DENIED as to all affirmative defenses except a) statute of limitations barring claims on behalf of note-holders, b) waiver and estoppel, c) common law collateral source, and d) the Leone defendants' defense of waiver and laches;

2) The Freeborn defendants have withdrawn defenses 24, 25 and laches so Sender's motion (Docket # 455) as to these defenses is DENIED as moot;

3) Sender's motion for summary judgment, (Docket # 455), upon all of the Leone defendants' counterclaims is GRANTED and those counterclaims are DISMISSED;

4) The Freeborn defendants' motion for summary judgment (Docket # 500) is GRANTED as to Sender's claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, violation of COCCA, civil conspiracy, and punitive damages and is otherwise DENIED.

41

5) The only claims remaining against the Freeborn defendants are claim 14, breach of fiduciary duty, claim 16, legal malpractice, claim 33, fraudulent transfer - actual, and claim 34 fraudulent transfer - constructive; all on behalf of Lifeblood,

6) The only claims remaining against the Leone defendants are claim 7, aiding and abetting breach of fiduciary duty, claim 13, breach of fiduciary duty, claim 17, legal malpractice, claim 33, fraudulent transfer – actual, and claim 34, fraudulent transfer-constructive; all on behalf of Lifeblood.

DONE and ORDERED, this ___20th___ day of March, 2006 at Denver, Colorado.

    s/Lewis T. Babcock
    United States District Chief Judge